RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

D.O.; A.O.; R.O.,

*Plaintiffs-Appellants,*

*v.*

No. 16-5461

VICKIE YATES BROWN GLISSON, in her official
capacity as Secretary for the Cabinet for Health and
Family Services,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for
the Eastern District of Kentucky at Lexington.
No. 5:15-cv-00048—Danny C. Reeves, District Judge.

Argued: November 29, 2016

Decided and Filed: January 27, 2017

Before: DAUGHTREY, CLAY, and COOK, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Richard F. Dawahare, MCCLELLAND & ASSOCIATES, PLLC, Lexington, Kentucky, for Appellants. David Brent Irvin, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Richard F. Dawahare, MCCLELLAND & ASSOCIATES, PLLC, Lexington, Kentucky, for Appellants. David Brent Irvin, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellee.

---

**OPINION**

---

COOK, Circuit Judge.  The federal Child Welfare Act ("the Act") specifies that "[e]ach State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative . . . into foster care." 42 U.S.C. § 672(a).  This appeal asks whether the Act creates a private right to foster-care maintenance payments enforceable by a foster parent under 42 U.S.C. § 1983.  We find that it does, and therefore reverse the district court's contrary decision.

I.

In 2012, Kentucky's Health and Family Services commenced a Dependency, Neglect, and Abuse proceeding against the mother of two young boys.  The mother stipulated to neglecting her children, and Kentucky placed both boys in foster care.  Plaintiff R.O., the mother's aunt, sought custody of the children.  The state "conducted a standard home evaluation and criminal background check on R.O. and eventually both children were placed in her home by Court Order."  In September 2014, the family court closed the action and granted joint custody to both the mother and the aunt, though the boys remained living with the aunt.

R.O. filed a motion with the family court seeking foster care maintenance payments.  The court declined to rule on the issue, however, "indicating that permanency had been achieved." R.O. then sued the Secretary for Kentucky's Cabinet for Health and Family Services ("the Cabinet" or "Kentucky") in state court, arguing that the federal Child Welfare Act required the state to provide maintenance payments, and that the failure to make payments violated the Constitution's Equal Protection and Due Process Clauses.  The Cabinet removed the case to federal court and filed a motion to dismiss, or in the alternative, a motion for summary judgment. The district court granted the Cabinet's motion, reasoning that the Child Welfare Act provides no privately enforceable rights, that the family lacked a property interest in the payments, and that Kentucky's scheme rationally distinguished between relative and non-relative foster care providers.  The family appealed.

II.

The court "review[s] a grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011) (citing *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009)). "Summary judgment is appropriate where the movant demonstrates that there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

III.

In 1980, Congress passed the Child Welfare Act, also known as Title IV-E of the Social Security Act. This federal-state grant program facilitates state-run foster care and adoption assistance for children removed from low-income homes. *See* 42 U.S.C. § 670. Congress passed the Act under its Spending Clause power, U.S. Const. art. I, § 8, and like other federal-state cooperative programs, states are given the choice of complying with the Act's conditions or forgoing federal funding.

Three sections of the Act are relevant here. *First*, to be eligible for federal funds, a state must submit a plan to the Secretary of Health and Human Services that satisfies thirty-five specific criteria. 42 U.S.C. § 671(a). If a state's plan fails to "substantial[ly] conform[]" to the Act's requirements, *id.* § 1320a-2a, the Secretary, after giving the state an opportunity to implement a corrective action plan, must withhold federal money, *id.* § 1320a-2a(b)(3)(A), (4)(A).

*Second*, the plan must "provide[] for foster care maintenance payments in accordance with section 672." *Id.* § 671(a)(1). Under § 672, "[e]ach State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative . . . into foster care." *Id.* § 672(a)(1). Foster care maintenance payments cover the cost of, among other things, the child's food, clothing, and shelter. *Id.* § 675(4)(A).

*Third*, after the state remits maintenance payments to the foster family, it may seek partial reimbursement from the federal government. Section 674(a)(1) provides that "each State which has a plan approved under this part shall be entitled to a payment equal to the sum of" an "amount equal to the Federal medical assistance percentage . . . of the total amount expended during such quarter as foster care maintenance payments under section 672 of this title for children in foster family homes or child-care institutions."

IV.

We first address the central issues on appeal: 1) whether the Act confers upon foster families a private right to foster care maintenance payments; and 2) whether that right is enforceable under § 1983.

1.     Private Right

Title 42 U.S.C. § 1983 imposes liability on anyone who, acting under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." This section authorizes suits to enforce individual rights under federal statutes as well as the Constitution. *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980). Nonetheless, "§ 1983 does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). Rather, "to sustain a § 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." *Id.* at 120 (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)).

For this court to find an individually enforceable right: 1) "Congress must have intended that the provision in question benefit the plaintiff"; 2) the asserted right must not be "so vague and amorphous that its enforcement would strain judicial competence"; and 3) "the statute must unambiguously impose a binding obligation on the States." *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997) (internal citations and quotation marks omitted).

To illustrate, in *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006), we evaluated whether Medicaid's freedom-of-choice provision established enforceable rights. The provision reads:

"A State plan for medical assistance must . . . provide that [] any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required."  42 U.S.C. § 1396a(a)(23).   We held that the provision granted Medicaid-recipients an individually enforceable right to choose their medical provider, reasoning that the phrase "any individual eligible for medical assistance" evinced "the kind of individually focused terminology that unambiguously confers an individual entitlement under the law."  *Harris*, 442 F.3d at 461 (internal citation and quotation marks omitted).  We noted that "the mandate [] does not contain the kind of vagueness that would push the limits of judicial enforcement."  *Id.* at 462.  And we explained that "the 'must . . . provide' language of the provision confirms that the statute is 'couched in mandatory, rather than precatory, terms.'"  *Id*. (omission in original) (quoting *Blessing*, 520 U.S. at 341); *see also Barry v. Lyon*, 834 F.3d 706, 717 (6th Cir. 2016) (holding that the federal Supplemental Nutrition Assistance Program—mandating that "[a]ssistance under this program shall be furnished to all eligible households," 7 U.S.C. § 2014(a)—created a privately enforceable statutory right).

By contrast, in *Gonzaga University* the Supreme Court held that the Family Educational Rights and Privacy Act ("FERPA") failed to grant students a privacy right in their education records.  536 U.S. at 290.  The relevant statutory section provided:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of students without the written consent of their parents to any individual, agency, or organization.

*Id.* at 279 (omission in original) (quoting 20 U.S.C. § 1232g(b)(1)).  The Court reasoned in part that FERPA lacked "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights."  *Id.* at 287 (citing *Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001), and *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979)).  In particular, "FERPA's provisions speak only to the Secretary of Education, directing that 'no funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'"  *Id*. (quoting 20 U.S.C. § 1232g(b)(1)).  The nondisclosure provisions evinced an

"aggregate focus" that "speak only in terms of institutional policy and practice, not individual instances of disclosure," and "are not concerned with 'whether the needs of any particular person have been satisfied.'" *Id.* at 288 (quoting *Blessing*, 520 U.S. at 343–44).

Applied here, we conclude the Act confers upon foster parents an individually enforceable right to foster care maintenance payments. *First*, the Act mandates payments "on behalf of each child." 42 U.S.C. § 672(a)(1). This focus on individual recipients is similar to language creating private rights in *Harris* and *Barry*. Unlike *Gonzaga*, the Act requires individual payments and focuses on the needs of specific children, as opposed to merely speaking to the state's policy or practice. *Second*, the Act confers a monetary entitlement upon qualified foster families and includes an itemized list of expenses that the state must cover. 42 U.S.C. § 675(4)(A). It therefore lacks vague and amorphous terms that might strain judicial competence. *Finally*, § 672(a)(1)'s "shall make" language "unambiguously impose[s] a binding obligation on the States." *Blessing*, 520 U.S. at 341.

Kentucky makes several arguments to the contrary, though none are persuasive. It first argues that § 672(a) simply sets out the preconditions that a state must satisfy to receive federal reimbursement. In support, it points to a different statutory section, § 674(a)(1), which provides that "each State which has a plan approved under this part shall be entitled to a payment equal to the sum of" an "amount equal to the Federal medical assistance percentage . . . of the total amount expended during such quarter as foster care maintenance payments under section 672 of this title for children in foster family homes or child-care institutions." 42 U.S.C. § 674(a)(1). Based on this section, Kentucky invokes the Eighth Circuit's reasoning that the "function of § 672(a) is to serve as a roadmap for the conditions a state must fulfill in order for its expenditure to be eligible for federal matching funds; otherwise, the state bears the full cost of these payments." *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1198 (8th Cir. 2013) (citing § 674(a)(1)).

We disagree. If § 672(a) simply provides a roadmap that states may choose to follow to receive matching funds, then Congress would not have phrased the section in mandatory terms. Indeed, once the Secretary approves the state's plan, the state "*shall* make foster care maintenance payments." 42 U.S.C. § 672(a)(1) (emphasis added). It isn't optional.

And although a separate section of the Act requires the federal government to partially reimburse these costs, nothing in § 672(a) mentions funding.

Kentucky next contends that the Act "'do[es] not speak directly to the interests' of foster parents; rather, [it] 'speak[s] to the states as regulated participants in the [Act].'" Appellee Br. 36 (quoting *Midwest Foster Care*, 712 F.3d at 1197). Kentucky suggests that when Congress writes in the active voice, making the state the subject, its focus is on the state as the regulated entity, and courts should not infer a private right to whatever benefit the state is supposed to provide. Thus, because Congress wrote in the active voice—"[e]ach State with a plan approved under this part shall make foster care maintenance payments on behalf of each child," 42 U.S.C. § 672(a)—Kentucky argues the law does not create a private right. *Cf. New York State Citizens' Coal. for Children v. Carrion*, 31 F. Supp. 3d 512, 521 (E.D.N.Y. 2014) ("If the statute were worded differently, and § 672(a)(1) read: 'No eligible child shall be denied foster care maintenance payments by a State with an approved plan,' a reasonable reader might find the requisite 'rights-creating' language.").

Both the Supreme Court and the Sixth Circuit, however, have found that laws phrased in the active voice, with the state as the subject, confer individually enforceable rights. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502–03, 509–10 (1990), *superseded on other grounds by statute*; *Harris*, 442 F.3d at 461–62. This should not be surprising: Congress must not only use rights-creating language, but also "unambiguously impose a binding obligation on the States." *Blessing*, 520 U.S. at 341. When Congress names the state as the subject, writes in the active voice, and uses mandatory language, it leaves no doubt about the actor's identity or what the law requires.

Last, Kentucky argues that because the Act "does not dictate the amounts that States must pay to foster parents," it is not "sufficiently specific and definite to qualify as enforceable under § 1983." But the Supreme Court in *Wilder* recognized a private right to a monetary benefit even though the law granted states discretion to set the applicable rate.[1] "That the [statute] gives the

---

[1]The relevant provision of the Medicaid Act mandates that "a State plan for medical assistance must provide for payment of the hospital services . . . through the use of rates . . . which the State finds . . . are reasonable and adequate." *Wilder*, 496 U.S. at 502–03 (internal alterations and citation omitted).

States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the [statute], but it does not render the [statute] unenforceable by a court." *Wilder*, 496 U.S. at 519. And as the Ninth Circuit explained when evaluating this provision, "[i]f a statute or applicable federal requirement does not prescribe a particular methodology for calculating costs, we give deference to a reasonable methodology employed by the State." *Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 981 (9th Cir. 2010). Here, it is undisputed that Kentucky established foster care maintenance payment rates. And neither party contends that Kentucky's rate-setting methodology is unreasonable.

Accordingly, § 672(a) confers an individually enforceable right to foster care maintenance payments.

2.      Enforcement Under § 1983

Once a plaintiff demonstrates that a statute creates a private right, "there is only a rebuttable presumption that the right is enforceable under § 1983." *Abrams*, 544 U.S. at 120 (quoting *Blessing*, 520 U.S. at 341). The state may rebut the "presumption by demonstrating that Congress did not intend that remedy for a newly created right." *Id.* (citing *Blessing*, 520 U.S. at 341, and *Smith v. Robinson*, 468 U.S. 992, 1012 (1984)). "[E]vidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (internal quotations and citations omitted).

In *Wilder*, the Medicaid Act "authorize[d] the Secretary to withhold approval of plans," to "curtail federal funds to States whose plans are not in compliance," as well as required States to set up an administrative review system. 496 U.S. at 521–22. Notwithstanding these procedures, the Court found that "the Secretary's limited oversight" and "[t]he availability of state administrative procedures . . . do[] not foreclose resort to § 1983." *Id.* at 522–23. Similarly, in *Harris*, we held that a plaintiff could sue under § 1983 because the Medicaid Act "does not provide other methods for private enforcement of the Act in federal court." 442 F.3d at 462 (citations omitted). Further, we noted that the Secretary's authority to "withhold funds to

non-complying States" and "the Act's requirement that States grant an opportunity for a fair hearing . . . [are not] inconsistent with a private action." *Id.* at 463 (internal quotation marks and citations omitted); *see also Blessing*, 520 U.S. at 348 (finding that Congress left open access to § 1983 because the statute "contains no private remedy . . . through which aggrieved persons can seek redress," and the Secretary could "audit only for 'substantial compliance' on a programmatic basis"); *Wright v. Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 427–28 (1987) (same).

Here, the Act's weak enforcement mechanisms fall short of foreclosing access to § 1983 remedies. Like in *Wilder*, *Blessing*, and *Harris*, the Secretary reviews the state's plan only on a program-wide basis, and lacks authority to ensure the state provides benefits to individual foster parents. Indeed, a state could implement a plan that substantially conforms to the Act's requirements, yet neglect to pay foster parents in individual cases. Absent resort to § 1983, foster families possess no federal mechanism to ensure compliance with the Act. And although the Act requires states to provide for administrative review of denied claims, 42 U.S.C. § 671(a)(12), the "availability of state administrative procedures ordinarily does not foreclose resort to § 1983." *Wilder*, 496 U.S. at 523; *see also Harris*, 442 F.3d at 463.

Kentucky's arguments to the contrary rely on the Supreme Court's *Gonzaga* decision. There, however, FERPA "expressly authorized the Secretary of Education to 'deal with violations' of [FERPA]," and established a review board to adjudicate individual written complaints. *Gonzaga*, 536 U.S. at 289 (quoting 20 U.S.C. § 1232g(f)). The Court found that "[t]hese administrative procedures squarely distinguish this case from *Wright* and *Wilder*, where an aggrieved individual lacked any federal review mechanism." *Id.* at 289–90. Notably, the Court inserted a footnote opining that it "need not determine whether FERPA's procedures are 'sufficiently comprehensive' to offer an independent basis for precluding private enforcement, due to our finding that FERPA creates no private right to enforce." *Id.* at 290 n.8 (citation omitted). In any event, the Child Welfare Act, unlike FERPA, includes no private federal review mechanism that an aggrieved foster family can employ.

In sum, we hold that the Act confers foster families with an individual right to foster care maintenance payments enforceable under § 1983.

V.

Having determined that the Act creates an individually enforceable statutory right, we next evaluate whether the Plaintiffs are entitled to maintenance payments. Section 672(a) restricts the class of children entitled to benefits in two relevant ways. *First*, the child must be in the Cabinet's custody; once the child is adopted or placed in a permanent guardianship, the Act no longer requires maintenance payments. 42 U.S.C. § 672(a)(2)(B). *Second*, the child must be placed in a licensed or approved "foster family home." *Id.* § 672(a)(2)(C). The district court did not address whether the children satisfy these qualifications because it found the Act failed to create a private right. Plaintiffs contend that both conditions are met, and ask the court to order the Cabinet to make payments. We address each criterion in turn.

1.    State Custody

Section 672(a)(2)(B) requires the Cabinet to make maintenance payments only when "the child's placement and care are the responsibility of . . . the State agency administering the State plan." 42 U.S.C. § 672(a)(2)(B). Both parties agree that the Cabinet need only make payments on behalf of children that are in its custody. Furthermore, there is no doubt that the Cabinet obtained responsibility for the children when the family court removed them from their mother's home.

The issue is whether the family court discharged the children from the Cabinet's care when it ordered the boys to live with the aunt and closed the case. The answer turns on Kentucky law. In Kentucky, "[i]f a child has been removed from the home and placed in the custody of . . . the cabinet, a judge of the District Court shall conduct a permanency hearing" on an annual basis. Ky. Rev. Stat. Ann. § 610.125(1) (West 2016). At the permanency hearing, the judge must decide, among other things, whether the child should be placed for adoption, placed with a permanent custodian, returned to the parent, or kept in foster care. *Id.* The Family Court Rules of Procedure and Practice provide that "[a]ny order of permanent custody" must be on form AOC-DNA-9. Fam. Ct. R. P. Prac. 22(4). Pursuant to that form, the court must affirmatively place the child in permanent custody and discharge the Cabinet of further responsibility.

The parties proceeded below on stipulated facts because the family court records are sealed. The only facts regarding the children's placement with the aunt are as follows:

- "R.O. was granted temporary custody by the Fayette Family Court of D.O. on March 27, 2013."

- "R.O. also accepted placement of A.O. on February 21, 2014 via Order of Fayette Family Court where the DNA case of A.O. had also been transferred."

- "On September 10, 2014, the Fayette Family Court closed the DNA action of both boys by granting joint custody to R.O. and C.O. The children were Ordered to reside with R.O."

- "Although the [guardian ad litem] made a Motion [to Order the Cabinet to pay maintenance fees] on May 14, 2014, the Court declined to issue further Orders on May the 21st, indicating that permanency had been achieved."

Though the Cabinet avers that R.O. is the children's permanent guardian, it has not identified evidence that the family court held a permanency hearing or discharged the children from the Cabinet's care. For its part, the family contends that the Order granting R.O. custody "was issued in a DNA review hearing, not in a permanent custody hearing as required" by state law, and that the "order was simply written on the docket sheet. It was not entered on the AOC-DNA-9 Order-Permanent Custody form as required by Rule 22."

In a supplemental memo and at oral argument, the Cabinet contended that the children must be in R.O.'s permanent custody because the family court closed the case. According to the Cabinet, if we find the children remain in state custody, it will create an "indeterminate legal purgatory" for children not in permanent custody, but also without an open family court case. But under Kentucky law, there is nothing indeterminate about the children's status: foster children remain in the Cabinet's custody until formally discharged by court order. The Cabinet also suggested that requiring strict adherence to state law elevates form over substance. We are unpersuaded. Requiring the Cabinet to abide by proper procedures promotes important interests—namely, certainty about the custody status of foster children.

Thus, on remand the district court should determine whether the family court affirmatively discharged the children from the Cabinet's custody. If the court finds no affirmative discharge, then the children remain the Cabinet's responsibility.

2.      Foster Family Home

The Cabinet must provide maintenance payments only if "the child has been placed in a foster family home or child-care institution." 42 U.S.C. § 672(a)(2)(C). The Act defines "foster family home" to mean a "home for children which is licensed by the State in which it is situated *or has been approved*, by the agency of such State having responsibility for licensing homes of this type, as meeting the standards established for such licensing." *Id.* § 672(c) (emphasis added).

The Act contemplates two categories of foster families. The first category includes licensed foster parents, who usually care for unrelated foster children. To become licensed, prospective foster parents must satisfy certain safety standards, which include passing a background check and submitting to a home evaluation. *Id.* § 671(a)(20). The state also establishes non-safety standards, *id.* § 671(a)(10), which in Kentucky include mandatory periodic training.

The second category consists of approved foster homes, which typically care for a relative child. Reflecting Congress's preference that children live with family members, *id.* § 671(a)(19), the Act allows states to place children with unlicensed relatives. To obtain approval, the home must "meet[] the standards established for such licensing." *Id.* § 672(c). Each state may waive non-safety standards on a case-by-case basis for children in relative foster family homes. *Id.* § 671(a)(10)(D). Furthermore, the Act requires states to give preference to adult relative caregivers only when the relative caregiver meets the relevant safety standards. *Id.* § 671(a)(19).

Here, the parties stipulated to the following:

- "[The mother] stipulated to dependency of A.O. on December 13, 2012 in the private petition in Clark County and to neglect of D.O. in April of 2013 in the Fayette County Family Court DNA proceeding. Accordingly, A.O. was initially placed with the person who made the petition, a non-relative placement, and D.O. was initially placed in foster care."

- "R.O. is the maternal great aunt of the children. She is a para-educator (teacher's assistant) for Fayette County public schools. CHFS conducted a standard home

evaluation and criminal background check on R.O. and eventually both children were placed in her home by Court Order."

The family argues that the Cabinet approved R.O. to be a foster parent. Prior to placement, the Cabinet verified that R.O. met relevant non-safety standards by conducting a home evaluation and a background check. After determining that her home was safe, the family court moved the children from another foster provider to her care. R.O. therefore argues that the Cabinet "approved" her as a foster parent for the children.

Kentucky offers several arguments in response. Kentucky distinguishes between "foster care" and "kinship care." According to Kentucky, "foster care" refers to licensed foster family homes. "Kinship care," by contrast, refers to relative caregivers. Although the Cabinet must remit maintenance payments to foster parents, the Cabinet need only pay kinship care providers "[t]o the extent funds are available." Ky. Rev. Stat. Ann. § 605.120(5) (West 2016). Due to inadequate appropriations, Kentucky ceased funding its kinship care program.

To the extent the Cabinet's failure to make maintenance payments turns on the distinction between relative and non-relative foster care providers, it plainly violates federal law. In *Miller v. Youakim*, 440 U.S. 125 (1979), Illinois placed two children with their older sister, Linda Youakim, and her husband. *Id*. at 130. "The Department investigated the Youakim home and approved it as meeting the licensing standards established for unrelated foster family homes . . . ." *Id*. Yet, "[d]espite this approval, the State refused to make Foster Care payments on behalf of the children because they were related to Linda Youakim." *Id*. The Court reviewed the definition of "foster family home." *Id*. at 130–31. After noting that the statute "defines this phrase in sweeping language," the Court found that "Congress manifestly did not limit the term to encompass only the homes of nonrelated caretakers. Rather, any home that a State approves as meeting its licensing standards falls within the ambit of this definitional provision." *Id*. at 135.

Though Congress changed aspects of the Act over the ensuing years, it has not added any provision distinguishing relative and non-relative foster care providers. Nor has it modified the definition of "foster family home" that the Court interpreted in *Youakim*. *Compare id*. (defining "foster family home" under prior version of the Act), *with* 42 U.S.C. § 672(c). Thus, if

Kentucky is denying benefits because the aunt is related to the children, it is violating federal law.

> Second, Kentucky notes that the Act makes kinship guardianship assistance optional:

> [A]t the option of the State, [the plan] provides for the State to enter into kinship guardianship assistance agreements to provide kinship guardianship assistance payments on behalf of children to grandparents and other relatives who have assumed legal guardianship of the children for whom they have cared as foster parents and for whom they have committed to care on a permanent basis, as provided in section 673(d) of this title.

42 U.S.C. § 671(a)(28). Under § 673(d), states may provide kinship guardianship assistance on behalf of children who previously resided "for at least 6 consecutive months in the home of the prospective relative guardian" and for whom the prospective guardian committed to caring on a permanent basis. *Id*. § 673(d)(3)(A). But kinship guardianship assistance applies only when the relative becomes the child's permanent guardian, not while the child is in temporary status. As noted above, it is unclear whether R.O. is the children's permanent guardian, or whether the placement is temporary. If R.O. has temporary custody of the children, then the Cabinet's argument about kinship guardianship assistance is irrelevant.

Accordingly, because the Cabinet "conducted a standard home evaluation and criminal background check on R.O." prior to delivering the children to her care, she is an approved foster care provider.

## VI.

For the foregoing reasons, the district court's decision is reversed. Upon remand, the district court shall determine whether the Cabinet maintains responsibility for the children's "placement and care." If the Kentucky court discharged the children from the Cabinet's custody, then the district court should dismiss the case. If not, then the district court shall award foster care maintenance payments.[2]

---

[2]Because we resolve this appeal on statutory grounds, we need not address the family's constitutional arguments.