*New York State Citizens' Coal. for Children v. Poole*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of August, two thousand nineteen.

PRESENT:

ROBERT A. KATZMANN,
*Chief Judge*,
JOSÉ A. CABRANES,
ROSEMARY S. POOLER,
PETER W. HALL,
DEBRA ANN LIVINGSTON,
DENNY CHIN,
RAYMOND J. LOHIER, JR.,
SUSAN L. CARNEY,
RICHARD J. SULLIVAN,
JOSEPH F. BIANCO,
MICHAEL H. PARK
*Circuit Judges.*

---

NEW YORK STATE CITIZENS' COALITION
FOR CHILDREN,

*Plaintiff-Appellant*,

v.                                                          No. 14-2919

SHEILA J. POOLE, Acting Commissioner for
the New York State Office of Children and
Family Services, in his official capacity,

1

*Defendant-Appellee.*

For Plaintiff-Appellant:    Grant J. Esposito, Adam J. Hunt, Morrison & Foerster LLP, New York, NY; Brian R. Matsui, Esq., Morrison & Foerster LLP, Washington, DC.

For Defendant-Appellee:   Caroline A. Olsen, Assistant Solicitor General; Barbara D. Underwood, Solicitor General; Steven C. Wu, Deputy Solicitor General *for* Letitia James, Attorney General for the State of New York.

Following disposition of this appeal on April 19, 2019, an active judge of the Court requested a poll on whether to rehear the case *en banc*. A poll having been conducted and there being no majority favoring *en banc* review, rehearing *en banc* is hereby **DENIED**.

Debra Ann Livingston, *Circuit Judge*, joined by José A. Cabranes, Richard J. Sullivan, Joseph F. Bianco, and Michael H. Park, *Circuit Judges*, dissents by opinion from the denial of rehearing *en banc*.

José A. Cabranes, *Circuit Judge*, dissents by opinion from the denial of rehearing *en banc*.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

**DEBRA ANN LIVINGSTON, *Circuit Judge*, joined by JOSÉ A. CABRANES, RICHARD J. SULLIVAN, JOSEPH F. BIANCO, and MICHAEL H. PARK, *Circuit Judges*, dissenting from the denial of rehearing *en banc*:**

By a vote of six to five, the active members of this Court decline to rehear a case presenting an issue of "exceptional importance"—an issue that now divides four United States Courts of Appeals.[1]    Fed. R. App. P. 35(a).    The panel majority holds that the Adoption Assistance and Child Welfare Act of 1980 (the "CWA" or the "Act"), 42 U.S.C. § 670 *et seq.*, creates a privately enforceable right under 42 U.S.C. § 1983 by which some foster care parents and providers may sue States for costs related to childrearing.    In implying this right of action, the majority tasks federal district judges across the three States of our Circuit with setting the rates at which this subset of foster care parents and providers should be compensated for items such as a child's "food, clothing, shelter, daily supervision, [and] school

---

[1] *Compare New York State Citizens' Coalition for Children v. Poole*, 322 F.3d 69 (2d Cir. 2019) (finding a right privately enforceable under § 1983 to recover "foster care maintenance payments" in the CWA); *D.O. v. Glisson*, 847 F.3d 374 (6th Cir. 2017) (same); *Cal State Foster Parents Ass'n v. Wagner*, 624 F.3d 974 (9th Cir. 2010) (same), *with Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190 (8th Cir. 2013) (holding that the CWA does not confer a privately enforceable right to "foster care maintenance payments"); *see Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 170 (D. Mass. 2011) ("Federal courts are divided as to whether the [CWA] creates privately enforceable rights to . . . foster care maintenance payments."); *see also 31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003) (holding that provisions of the CWA requiring that a foster care child's health and education record be reviewed do not confer a privately enforceable right under § 1983).

supplies," *id.* § 675(4)(A), pursuant to a statute that contains not a word of guidance for making such judgments.[2]  In its forceful petition for rehearing *en banc*, the State of New York argues that the panel majority's holding will require States "to prioritize spending on the limited set of children and expenditures eligible for partial federal reimbursement, at the expense of the much broader population of children that New York and other States have chosen to benefit," while at the same time "subjecting States to the risk of multiple, inconsistent judgments about proper foster care reimbursement rates."  Petition for Rehearing En Banc at 1, 3, *New York State Citizens' Coalition for Children v. Poole*, 922 F.3d 69 (2d Cir. 2019) [hereinafter Petition for Rehearing].  Connecticut, along with over a dozen other States joining in an *amicus* brief, agrees with New York.  It too argues that the majority's privately enforceable right will impose immense

---

[2] Section 675 of the Act, entitled "Definitions," defines "foster care maintenance payments" as:

> payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement.   In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

*Id.* § 675(4)(A).

burdens on State foster care systems and represents a "costly condition . . . that Congress did not impose and to which the . . . States did not agree when entering into [this] relationship with the federal government." Brief for Amici Curiae States Supporting Respondents at 2, *New York State Citizens' Coalition for Children v. Poole*, 922 F.3d 69 (2d Cir. 2019); *see also Armstrong v. Exceptional Child Care Center*, 135 S. Ct. 1378, 1389 (2015) (Breyer, *J.*, concurring in part and concurring in the judgment) (noting the "increased litigation, inconsistent results, and disorderly administration" that result from judicial rate setting).

The panel majority's decision imposes these pernicious costs on our Circuit despite the fact that the right it identifies is not even fairly discernible, much less unambiguously manifest, in the text of the CWA. Congress simply did not create an individual right to foster care maintenance payments enforceable pursuant to § 1983 in the "Definitions" section of this Spending Clause legislation. *See Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1197 (8th Cir. 2013) ("[F]inding an enforceable right solely within a purely definitional section is antithetical to requiring unambiguous congressional intent."). In deciding to the contrary, the panel majority misconstrues the Act and ignores decades of Supreme Court precedent, choosing instead to resurrect the Court's long-abandoned "*ancien*

3

*regime*" of readily implied causes of action. *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). Because the majority's decision is wrong, will dissipate scarce foster care dollars, and will impose litigation burdens in this Circuit that far outweigh the additional work required for *en banc* review, I dissent from the denial of rehearing *en banc*.

*      *      *

The CWA, enacted almost 40 years ago, offers fiscal incentives to participating States "to encourage a more active and systematic monitoring of children in the foster care system." *Vermont Dep't of Soc. & Rehab. Servs. v. U.S. Dep't of Health & Human Servs.*, 798 F.2d 57, 59 (2d Cir. 1986). As the dissent from the panel majority's decision lays out more fully, by incentivizing appropriate foster care *arrangements*, the CWA does not in some way *sub silentio* grant a subset of New York foster parents and providers a privately enforceable right under 42 U.S.C. § 1983 to recover "foster care maintenance payments." *See Poole*, 922 F.3d at 85–101 (Livingston, *J.*, dissenting). The panel majority makes two fundamental mistakes in concluding to the contrary.

As to the first mistake: the CWA provides partial reimbursement to participating States of "foster care maintenance payments" made by these States

4

on behalf of eligible children, if the States otherwise satisfy the requirements of the Act. *See* 42 U.S.C. §§ 671, 675. But the panel majority concludes that by providing that States "shall make" foster care maintenance payments, *id.* § 672(a)(1), the CWA *also* imposes a minimum foster care spending obligation on recipient States, requiring the States to cover the entire cost of a slew of items listed as reimbursable in § 675(4)(A), despite the fact that the States do not even receive full federal reimbursement for those items. Put differently, the panel majority determines that the partial federal support system supplied by the CWA imposes a categorical foster care *spending requirement* on all recipient States, notwithstanding any limits their legislatures may have placed on these expenditures. This is not a reasonable interpretation of §§ 672 and 675. These provisions are instead best read as identifying certain categories of State payments that are *eligible* for partial federal *reimbursement*, but leaving to the discretion of the States which payments to make in the first instance.[3] *See Poole*, 922 F.3d at 86–92

---

[3] The Department of Health and Human Services ("HHS") has consistently interpreted the statute as merely stipulating reimbursement eligibility requirements. To take one example, in 2008, Congress amended the definition of "foster care maintenance payments" to include "payments to cover the cost of (and the cost of providing) . . . reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110–351, 122 Stat 3949 (2008) (current version at 42 U.S.C. § 675(4)(A)). But HHS did not interpret this amendment as *requiring* States to pay for such travel: "As

(Livingston, *J.*, dissenting).  State authorities direct their own foster care programs—not federal courts.

But even if §§ 672 and 675 *do* impose a spending obligation on the States (and they do not), the panel majority errs a second time in concluding that the CWA also confers on a subset of New York caregivers a *right*, enforceable under § 1983, to a monetary amount that "cover[s] the cost of" these "foster care maintenance payments."  *Poole*, 922 F.3d at 77.  As the panel majority is well aware, the Supreme Court has "rejected the notion" that its precedent "permit[s] anything short of an *unambiguously* conferred right to support a cause of action brought under § 1983."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis added).  And the Court has reminded us that the dangers of implying enforceable rights are particularly acute with regard to Spending Clause legislation, which is "much in the nature of a contract."  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  After all, "[t]he legitimacy of Congress' power to legislate . . .

---

with any cost enumerated in the definition of foster care maintenance payments," it said, "the [State] agency may decide which of the costs to include in the child's foster care maintenance payment."    U.S. Dep't of Health & Human Servs., Program Instruction No. ACYF-CB-Pl-10-11 at 20, http://perma.cc/9LX9-C76D; *see also* U.S. Dep't of Health & Human Servs., Child Welfare Policy Manual § 8.3B.1(9) (2018) (noting that Boy Scout dues qualify as "incidentals" and are therefore "*reimbursable*" under the CWA (emphasis added)).

rests on whether the State voluntarily and knowingly accepts the terms of [this] 'contract,'" and an implied right of action constitutes a critical contractual term. *Suter v. Artist M.*, 503 U.S. 347, 356 (1992) (quoting *Pennhurst*, 451 U.S. at 17); *see also Poole*, 922 F.3d at 92–93 (Livingston, *J.*, dissenting) (outlining the Court's jurisprudence in this area); *Kapps v. Wing*, 404 F.3d 105, 127 (2d Cir. 2005) (recognizing that "the Court has appeared to be increasingly reluctant to find § 1983–enforceable rights in statutes which . . . set forth their requirements in the context of delineating obligations that accompany participation in federal spending clause programs").

The CWA does not come close to satisfying this demanding standard for recognizing a privately enforceable right under § 1983 to foster care maintenance payments. [4] The panel majority inexplicably charges that the dissent inappropriately "read[s] the tea leaves" to reach this conclusion, *Poole*, 922 F.3d at

---

[4] By contrast, the CWA unambiguously confers a private right of action to prevent States from making foster-care placement decisions on the basis of race, color, or national origin. *See* 42 U.S.C. §§ 671(a)(18), 674(d)(3)(A) ("Any individual who is aggrieved by a violation of section 671(a)(18) [prohibiting racial discrimination in foster care or adoption denials] of this title by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court."). The absence of such rights-creating language in the foster care maintenance payment provisions at issue here strongly suggests that the omission was intentional. *See, e.g., Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir. 2002).

7

79—that the dissent rests on a mere prediction that the Supreme Court will abandon the factors set forth in its *Blessing* decision to guide judicial inquiry into whether a statute manifests an "unambiguous[ ]" intent to create a private right, *see Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997), when "this Court is not tasked with—and is, in fact, prohibited from—such guesswork." *Poole*, 922 F.3d at 79. In reality, each of the *Blessing* factors uniformly weigh against the presence in the CWA of a § 1983 right to a monetary amount that covers the cost of any and all "foster care maintenance payments."[5]  *See id.* at 94–97 (Livingston, *J.*, dissenting).

For example, *Blessing* asks us to consider whether "the right assertedly protected by the statute is . . . so 'vague and amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340–41.  If so, that factor weighs against the existence of the right.  *See id.*  Here, calculating the appropriate "cost" of "foster care maintenance payments" involves manifold policy judgments about foster care and childrearing, not to mention overall

---

[5] And the Supreme Court has warned against reading *Blessing* to thwart the Court's repeated directive that nothing less than an *unambiguously conferred right* is enforceable pursuant to § 1983.  *See Gonzaga*, 536 U.S. at 282–83 ("Some language in our opinions might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983.  *Blessing*, for example, set forth three 'factors' to guide judicial inquiry into whether or not a statute confers a right. . . . We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.").

program administration, that federal judges are ill-suited to make and that go entirely unmentioned in the statute that the panel majority interprets unambiguously to require these judgments. *Poole*, 922 F.3d at 95–97 (Livingston, *J.*, dissenting); *cf. Armstrong*, 135 S. Ct. at 1388 (Breyer, *J.*, concurring in part and concurring in the judgment) ("The history of ratemaking demonstrates that administrative agencies are far better suited to this task than judges."). How exactly should judges determine the "cost" of daily supervision, personal incidentals, and other expenses associated with childrearing? Should rates vary based on a family's income level or location, or a child's disability? Who can say, since the CWA, which does not contemplate federal courts' involvement in rate setting, says *not a word* about the standards according to which scarce foster care dollars are to be allocated?[6]

---

[6] As already noted, the CWA provides partial federal reimbursement of a State's foster care expenditures, but only with regard to the § 675(4)(A) items and only for *some* children—those who "would have otherwise qualified for assistance under the now-defunct Aid to Families with Dependent Children program." *Midwest Foster Care*, 712 F.3d at 1194. New York affirms that partial federal reimbursement is available for only about forty percent of the children in its foster care system. Petition for Rehearing at 7. The panel majority's conclusion that the CWA imposes a spending mandate on States, enforceable pursuant to § 1983, will thus not only confer on district courts a rate-setting obligation pursuant to a statute that provides no guidance for this task, but also have the likely effect, as New York argues, of arbitrarily "forc[ing] New York to decrease its payments for the costs and children who do not meet federal eligibility requirements." *Id.* at 15.

If the plain language of the statute and the *Blessing* factors were not formidable enough obstacles to the panel majority's conclusion, there is also the Supreme Court's recent pronouncement in *Armstrong v. Exceptional Childcare Center*, 135 S. Ct. 1378 (2015). In *Armstrong,* the Supreme Court held that § 30(A) of the Medicaid Act is not privately enforceable in equity because "[t]he sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy," demonstrates that Congress did not intend for private plaintiffs to enforce § 30(A) in courts. *Id.* at 1385. The Court rested its holding on the long line of precedent catalogued above, "establish[ing] that a private right of action under federal law is not created by mere implication, but must be 'unambiguously conferred.'" *Id.* at 1388 (quoting *Gonzaga*, 536 U.S. at 283). The panel majority bizarrely claims that *Armstrong* is inapposite. *Poole*, 922 F.3d at 85. But the Medicaid Act and the CWA have similar *administrative* (rather than judicial) enforcement schemes and, as already noted, determining appropriate reimbursement rates for childrearing expenses absent any statutory guidance presents major problems of judicial administrability, similar to those in *Armstrong*. *See id.* at 97–99 (Livingston, *J.* dissenting). In fact, the only significant distinction between the two cases—that the *Armstrong* plaintiffs brought suit in

equity rather than pursuant to § 1983—hurts the Plaintiffs here.   Those seeking to

bring a cause of action in equity benefit from a presumption that an equitable cause

of action exists, whereas those bringing suit under § 1983 labor under the opposite

presumption.   *Armstrong*, 135 S. Ct. at 1392 (Sotomayor, *J.*, dissenting).   Indeed,

the *Armstrong* plaintiffs did not even *attempt* to sue under § 1983, given this more

exacting burden.   *Id.* at 1386 n*; *see also Poole*, 922 F.3d at 98–99 (Livingston. *J*,

dissenting) (discussing the *Armstrong* decision).

Parsing recent Supreme Court pronouncements on implied rights of action,

however, is not really necessary here—belts and suspenders, so to speak.   From

the start, this case has been and remains remarkably easy.   The CWA simply does

not unambiguously confer a right to foster care maintenance payments

enforceable pursuant to § 1983.   The panel majority reaches the opposite

conclusion only by adopting a flawed construction of the Act and ignoring the

Supreme Court's "repudiat[ion of a] ready implication of a § 1983 action."

*Armstrong*, 135 S. Ct. at 1386 n*.   Its decision threatens to waste foster care

resources, arbitrarily divert scarce dollars from some children to others, and push

federal courts into a "traditional area of state concern."   *Moore v. Sims*, 442 U.S.

11

415, 435 (1979). Congress neither intended nor legislated for such an outcome. Our *en banc* Court should not countenance it.

*          *          *

One final word is in order. The narrow vote by a bare majority of our Court's active judges to decline *en banc* review might lead a reader to infer that these judges concur in the panel majority's holding and reasoning, despite all the arguments presented in the dissent. That would be a big mistake. Because of our Circuit's so-called "tradition" of declining *en banc* review, the fact that six members of our Court voted to decline review does not mean that they were convinced that the panel majority is correct. *See Ricci v. DeStefano*, 530 F.3d 88, 89 (2d Cir. 2008) (Katzmann, *J.*, concurring in the denial of *rehearing en banc*) (highlighting the Circuit's supposed "longstanding tradition of general deference to panel adjudication—a tradition which holds whether or not the judges of the Court agree with the panel's disposition of the matter before it"). Nor does it follow that these six judges deemed the matter unimportant or unexceptional. *See Landell v. Sorrell*, 406 F.3d 159, 167 (2d Cir. 2005) (Sack & Katzmann, *JJ.*, concurring in the denial of rehearing *en banc*) (suggesting that *en banc* review "only forestall[s] resolution of issues destined . . . for the Supreme Court"). *But see Ricci*,

12

530 F.3d at 92 (Jacobs, *J.*, dissenting from the denial of rehearing *en banc*) ("If issues are important enough to warrant Supreme Court review, they are important enough for our full Court to consider and decide on the merits.").

Our so-called *en banc* "tradition," however, is not a license to disregard the substantial consequences that will accompany this Court's mistaken judgments. Once the mandate issues in this case, the district court must commence its review of how New York "determined the amounts it pays" to those receiving foster care maintenance payments, and "how it has quantified the costs of the specific expenses listed in Section 675(4)," *Poole*, 922 F.3d at 82, so as to decide whether to approve or reject the State's foster care rates (again, as applied to a subset of its foster care parents and providers). In its petition for rehearing, New York warns that such review will unjustifiably inject federal courts into the "complex, judgment-laden process" by which New York, like other States, determines when and how to cover costs for particular children in foster care. Petition for Rehearing at 20. Resources may—and likely will—be squandered in litigation destined to produce "multiple, inconsistent" results. *Id.* at 3. Tradition shouldn't prevent this Court from reviewing an issue of such consequence.

As set forth above, the panel majority made a mistake in interpreting this

13

Spending Clause statute to impose a mandatory spending obligation on States, enforceable under § 1983. The full Court also errs in declining *en banc* review, but perhaps with less excuse. The panel majority simply made a mistake. To the extent that this *en banc* vote comes down to nothing more than an ostensible tradition, the full Court, with eyes open, has refused to afford New York State, the *amici*, and the foster care children within our jurisdiction the consideration they deserve.

**José A. Cabranes, *Circuit Judge*, dissenting from the order denying rehearing en banc:**

I respectfully join in Judge Livingston's opinion. The dissenters having failed to persuade a majority of the active judges to rehear this appeal, our concerns necessarily now rest in the hands of our highest court. I write separately, and in my name alone, for the sole purpose of re-stating some earlier observations regarding aspects of the en banc practice of the Second Circuit. *See generally United States v. Taylor*, 752 F.3d 254, 255–57 (2d Cir. 2014) (Cabranes, *J.*, dissenting from order denying rehearing en banc).

As I observed on that earlier occasion, an observer can draw only one firm conclusion from our decision not to rehear this case before the full court of active judges—namely, that the opinion dissenting from the denial of en banc review (here, by Judge Livingston) is, by definition, an expression of the view of the five subscribing judges that the panel's resolution of this case presents legal issues of exceptional importance.

By contrast, the order denying rehearing without elaboration may, or may not, reflect the substantive views of the particular judges in the six-judge majority voting against rehearing.

In light of how judges in the Second Circuit have historically exercised their discretion, the decision not to convene the en banc court does not necessarily mean that a case either lacks significance or was correctly decided. Indeed, the contrary may be true. The story of our vaunted en banc "traditions" is fully described in my dissent from the denial of rehearing in *Taylor*. Suffice it to say that this tradition is a sometime thing, and some who invoke it have no difficulty abandoning it when convenient.

All one can know for certain about a vote like this one is that six active circuit judges did not wish to rehear this case—perhaps because of a general aversion to en banc rehearings, perhaps out of confidence that the Supreme Court will solve our problem, or perhaps because doing so would signal their investment in "collegiality"—while the five other active circuit judges strongly believed that the panel opinion presented multiple legal errors of exceptional importance warranting correction.