RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0226p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RICHARD K. ROSE,

           *Plaintiff-Appellant,*

    *v.*

STATE FARM FIRE & CASUALTY COMPANY,

           *Defendant-Appellee.*

No. 13-3887

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:10-cv-00874—George C. Smith, District Judge.

Argued: June 18, 2014

Decided and Filed: September 8, 2014

Before: SILER, GILMAN, and GIBBONS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Don C.A. Parker, SPILMAN, THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Appellant. Gregory A. Harrison, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Elliot G. Hicks, Michael G. Gallaway, SPILMAN, THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Appellant. Gregory A. Harrison, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellee.

---

**OPINION**

---

    SILER, Circuit Judge. Richard Rose owned a house in Ohio that burned in a fire. An investigation as to whether the fire was purposefully caused was ultimately inconclusive. Nevertheless, State Farm Fire and Casualty Company (State Farm), the holder of Rose's

homeowner's insurance policies, denied his claim. Rose initiated suit, alleging breach of contract and bad faith. State Farm asserted that the policies were void because Rose concealed material information about his financial status when he was interviewed after the fire. The district court agreed and granted summary judgment to State Farm on both of Rose's claims. Because we find that a factual question remains as to whether Rose misled State Farm's investigators regarding his financial situation, we **REVERSE** and **REMAND**.

**I.**

Rose owned a home in Bidwell, Ohio, that was insured by State Farm under a homeowner's policy that was in effect during the time of the fire. Although that policy covered most of his personal property, Rose also had a Personal Articles Policy that covered two Rolex watches. Collectively, these policies are the subject of this litigation.

On the morning of January 7, 2009, a fire destroyed Rose's home. The district court summarized the information Rose provided about that morning:

> On that day, [Rose's] wife left for work at her usual time, somewhere between 7:45am and 8:20am. [He] remained in the home with his four dogs. As was his usual custom, [Rose] believes he probably smoked a cigarette while drinking his coffee. At some point, he drove his SUV down his driveway to see if his neighbor was available to talk about some work the neighbor was supposed to perform on [Rose]'s property. The neighbor was not at his shop, and between five and ten minutes later, [Rose] returned to his property. While he was in the front of the property, he noticed smoke coming out of the upstairs foyer window. Because his front door was locked, [Rose] ran around to the unlocked backdoor where he saw smoke and flames through the double windows of his kitchen area. [Rose] then ran to the sliding glass door at the back of the house where his dogs were sitting, 'in a state of panic.' (Rose Dep. at 95). He opened the door and let his dogs out; the oldest dog had to be pulled out from underneath the dining room table. At this point the dogs were about twelve feet from where [Rose] had seen flames in the window. Shortly thereafter, the windows over the kitchen sink blew out. [Rose] then called 911 and placed his dogs in his truck. He could not recall whether the dogs were covered in soot or smelled of smoke. [Rose]'s wife testified that the dogs smelled and required baths and that one dog was seen by the veterinarian.

*Rose v. State Farm*, No. 2:10-cv-874, 2012 WL 3583248, at *1 (S.D. Ohio Aug. 20, 2012). Later that day, Rose reported to State Farm a fire loss with respect to his home and personal

property. He claimed $696,373.30 for the dwelling, $512,765.57 for damage to personal property, $30,000 for additional living expenses, and $29,850 for one Rolex watch.

State Farm assigned Rob Raker to investigate Rose's claim. On January 20, 2009, Raker took a recorded statement from Rose and his current wife, Shelly Rose. He also spoke with Rose's ex-wife, Kim Jividen, and gathered information by searching public records, such as court and real estate records. Raker also retained a fire investigator. After visiting the remains of the house, analyzing burn patterns, and consulting with electrical-engineering experts, the fire investigator issued a report regarding the cause of the fire. The report found that the fire originated in the kitchen area of the home, that electrical items did not appear to be the source of the fire, and that neither smoking nor cooking was suspected as a cause. Although the report indicated that non-reported human action could not be eliminated as a cause, it did not specifically conclude that the fire was "incendiary," i.e., deliberately ignited. At the conclusion of its investigation, State Farm denied Rose's claims for insurance proceeds. The company alleged Rose violated the "Intentional Acts" and "Concealment or Fraud" conditions of his respective insurance policies.[1]

In 2010, Rose sued for money damages in Ohio state court, alleging breach of contract against State Farm as well as a tort claim for bad faith. After State Farm properly removed the case to federal court on diversity grounds, both parties filed cross-motions for summary judgment. On the issue of whether the fire was incendiary, the district court found that multiple issues of material fact remained. Accordingly, the court declined to grant summary judgment to either party based on the "Intentional Acts" clause. The district court, however, did find that some of the answers Rose gave in his recorded statement to State Farm were both misleading and material. Specifically, it held that Rose's failure to identify multiple tax liens and judgments, when questioned by Raker about his financial status, voided his insurance policies under the

---

[1]Rose's homeowner's insurance policy with State Farm contained the following terms:

**Intentional Acts.** If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is void and we will not pay you or any other insured for this loss.

**Concealment or Fraud.** This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

Rose's Personal Articles policy contained substantially equivalent provisions.

concealment provisions in those contracts. As a result, the district court found that summary judgment in favor of State Farm was warranted. Subsequently, the district court denied Rose's Fed. R. Civ. P. 59(e) Motion to Alter or Amend Judgment.

## II.

We "review a district court order granting summary judgment under a de novo standard of review, without deference to the decision of the lower court." *Brannam v. Huntington Mortg. Co.*, 287 F.3d 601, 603 (6th Cir. 2002). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)). In reviewing a summary-judgment motion, we must view all the facts, evidence, and any inferences that may permissibly be drawn, in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Furthermore, although this court will "generally review a denial of a motion to alter or amend a judgment under Rule 59(e) for abuse of discretion, when the Rule 59(e) motion seeks review of a grant of summary judgment, . . . we apply a de novo standard of review." *Johnson v. City of Memphis*, 617 F.3d 864, 867 (6th Cir. 2010) (citing *Shelby Cnty. Health Care Corp. v. Majestic Star Casino, LLC*, 581 F.3d 355, 375 (6th Cir. 2009)) (internal quotation marks omitted).

## III.

To properly analyze whether the answers Rose provided in his recorded statement were intentionally misleading, it is necessary to review his entire exchange with Raker on the issue of prior lawsuits:

[Raker] Q. Uh, have you ever been involved in any type of lawsuit?
[Rose] A. Yes.
Q.     Just, from your expression it sounds like it might be lengthy list.
A.     You haven't been self-employed have you?
Q.     (inaudible)

A.      Uh, it's, uh, let's see I got sued for a lady breaking a tooth on a piece of food.  I got sued by a lady that said she fell in my parking lot because the parking lot was un, unsafe.  Uh, I'm in the middle of a lawsuit, an ongoing lawsuit now with, uh, Fifth Third Bank actually.

* * *

Q.      What's that relating to?

A.      Um, it's a business relationship that, uh, they reneged on and we filed a lawsuit against them.

Q.      So you're the plaintiff?

A.      No, well, probably ought to call the attorneys that's handling it in Columbus, (inaudible) Mark Kessler and let them talk about it with you.

Q.      Is it, well let me just ask.  Is it an individual suit or . . .

A.      No . . .

Q.      Is it one . . .

A.      It's a company.

Q.      Okay, which company?

A.      RSB.

Q.      RSB, okay.

A.      Uh, do you want his phone number?

Q.      Sure.

A.      614-233-5168

Q.      Okay, other suits?

A.      None that's, you know, nothing that's been to trial or nothing like that.

Q.      Okay, let me ask you this. Have there ever, have there been any judgments against you?

A.      Yes, Fifth Third's got one for four million dollars and they've had it for two years.

Q.      Is that this, this . . .

A.      Yes, that's all intertwined.

Q.      Where's that suit filed?

A.      Gallia County Courthouse.

Q.      Okay.

A.      And I don't have any (inaudible) you get stuff from vendors, like NTN is, they filed one for like 14 hundred dollars because I, I didn't owe it and I

told them I wasn't paying it, do what they had to do.  I mean it's a year and a half ago, uh but that's about it and like I said it's right there in the courthouse.

Q.     Okay and this all in Gallia County?

A.     Yes.

Q.     Any, any suits in any other counties?

A.     No.

Q.     In any other states?

A.     No.

State Farm contends that, based on this exchange and a 2006 judgment order from the Gallia County Common Pleas Court, the district court found that Rose concealed the existence of a $4,826,595.20 judgment against him *individually*.  The district court's opinion, however, offered no analysis on Rose's characterization of the Fifth Third Bank litigation as business-related (as opposed to implicating him individually).  Instead, the court appears to have based its concealment conclusion only on the "multiple tax liens and judgments" that Rose "failed to identify."  Regardless, State Farm's argument on this point is unpersuasive.

In order for State Farm to validly invoke the concealment provision voiding the insurance contract, the insured must have *intentionally* concealed or misrepresented a material fact; false statements alone are not enough.  *See Trzcinski v. Am. Cas. Co.*, 953 F.2d 307, 313 (7th Cir. 1992).  Rose's financial situation is undoubtedly a material issue here because it provides a potential motive for him to commit arson and collect on his loss.  *See Parker v. State Farm Fire & Cas. Co.*, No. C87-2683, 1988 WL 1058394, at *5 (N.D. Ohio Nov. 4, 1988).  The question, then, is whether Rose intentionally misrepresented his financial situation by providing knowingly false information to State Farm.

Viewed in a light most favorable to Rose, the statements he made regarding the Fifth Third litigation do not suggest an intent to conceal.  In response to an open-ended question on lawsuits, he volunteered the fact that a suit was on-going between himself and the bank.  Moreover, after having difficulty explaining the procedural posture of the case, Rose offered to let Raker talk to the attorney handling the case and provided that attorney's phone number.  Only when Raker asked whether it was "an individual suit" did Rose provide a response that was

arguably misleading.  He said, "No . . . it's a company."  Although Rose was indeed named as an individual party in the underlying action with Fifth Third, the litigation involved his business ventures, including RSB Restaurants, so it was both an individual and a company matter.  It is not difficult to see how, given these circumstances, a non-lawyer could fail to provide an accurate answer to Raker's question while not attempting to mislead or conceal.  Finally, Rose's response to Raker's subsequent question about judgments indicates no attempt to conceal that Fifth Third's judgment was against him personally:

> Q. Okay, let me ask you this.  Have there ever, have there been any judgments against you?
>
> A. Yes, Fifth Third's got one for four million dollars and they've had it for two years.

State Farm's alternative argument, which the district court ultimately found compelling, is that Rose violated the concealment provision of his insurance policies by failing to disclose multiple tax liens and judgments against him during the Raker interview.  "[A] misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *Latimore v. State Farm Fire & Cas. Co.*, No. 1:11-cv-272, 2012 WL 3061263, at \*4 (N.D. Ohio July 26, 2012) (quoting *Abon, Ltd. v. Transcon. Ins. Co.*, No. 2004-CA-0029, 2005 WL 1414486, at \*13 (Ohio Ct. App. June 16, 2005)).

State Farm and the district court both point to the negative responses Rose gave at the end of the exchange about suits in other counties and other states.  It is true that Rose, personally or through his businesses, has been a party to more than twenty lawsuits—some of which were outside Gallia County.  Also, in the years leading up to the fire in question, dozens of tax liens had been filed against him in multiple jurisdictions.  Nevertheless, Rose asserts that he completely cooperated with State Farm's investigation and his answers to Raker were not an attempt to conceal or mislead.  On balance, the record supports Rose's argument that his intention while making those statements is a question for a jury.

First, the record does not show that Raker ever asked Rose directly about tax liens.  Raker asked about lawsuits and judgments.  Because a tax lien in Ohio does not require the action of a

judge or jury before being converted to a judgment,**2** it is not difficult to imagine that a non-lawyer might differentiate between the two.  Also, since Rose apparently does not manage his own finances and taxes—relying instead on accountants—State Farm cannot point to any evidence showing that Rose was aware of those liens at the time of his statement to Raker.

Second, Rose's answers to Raker's questions about suits outside Gallia County might have been given in a specific context.  Just before giving his answers about suits outside Gallia County, Rose tried to explain how lawsuits are frequently brought against entrepreneurs by vendors with whom they have done business.  Rose's statement implied that he had been involved in several of these vendor-related suits, and he specifically directed Raker to the Gallia County Courthouse to find out more.  When Rose answered Raker's follow-up questions, his response could have been in the context of these vendor suits, not the entire body of suits he had ever been involved in.  Although perhaps not the simplest or most straightforward explanation, when viewed in a light most favorable to Rose, it is not necessarily one a jury would find unreasonable.

Finally, State Farm has the burden of establishing that Rose acted intentionally when he gave inaccurate answers regarding the existence of other lawsuits.  The overall context here supports the conclusion that a material fact dispute remains about Rose's intent.  When Rose answers Raker's initial question about prior lawsuits, Raker accurately interprets Rose's response to mean that the latter's litigation history will comprise a "lengthy list."  In his very next response, Rose volunteers information about three lawsuits, including his on-going litigation with Fifth Third Bank.  The existence of the sizeable judgment the bank had against him—$4.8 million—represented a potentially huge source of financial stress (and thus, motive) for Rose, yet he provided Raker with the location of the suit as well as the name and phone number of his attorney to find out more information.  In comparison, the amount of the pending suits and judgments that Rose did not mention is substantially lower.  Because Rose was forthcoming about his "lengthy" litigation history and the existence of a multi-million dollar judgment, a jury might reasonably conclude that he had little motive to conceal the existence of other, relatively minor legal debts.

---

**2***See* Ohio Rev. Code Ann. § 5739.13 and § 5733.11.

The cases on which State Farm relies—*Latimore*, 2012 WL 3061263; *Taylor v. State Farm Fire & Cas. Co.*, No. 3:11-cv-1714, 2012 WL 1643877 (N.D. Ohio May 10, 2012); and *Baymon v. State Farm Ins. Co.*, 257 F. App'x 858 (6th Cir. 2007)—are all distinguishable from the situation here. In *Latimore*, State Farm denied the fire-loss claim in part because the plaintiff "misrepresented his financial condition at the time of the fire loss." 2012 WL 3061263, at *1. Among other things, Latimore attempted to minimize his financial problems by understating the size and duration of his mortgages arrearages. *Id.* at *7. He also flatly denied any judgments existed against him when documentation existed showing he had signed a consent judgment just two months before the fire. *Id.* at *4. The district court found that Latimore's "story was ever changing and inconsistent" and, critically, that Latimore had "admitted to a number of material misrepresentations during the investigation of his fire loss." *Id.* at *7. Here, Rose readily disclosed significant financial liabilities from the beginning, and he has never conceded that any of his answers amounted to material misrepresentation regarding his financial status.

Similarly, in *Taylor*, State Farm denied a fire-loss claim because Valerie and Donald Taylor made multiple material misrepresentations during the company's investigation of the fire. 2012 WL 1643877, at *1. For example, Valerie Taylor stated that the subject property "was not and never had been subject to foreclosure and that she was current and had been current on all payments through 2010." *Id.* In fact, a foreclosure action had been filed three months prior to the fire, and a judgment of foreclosure had been obtained three days prior to the fire. *Id.* Importantly, though, the district court again noted that "[the Taylors] do not contend they were honest when [State Farm] questioned them about their financial status, including being late on several utility bills and child support payments." *Id.* at *3.

Finally, in *Baymon*, State Farm again denied a fire-loss claim based on material misrepresentations made by the insureds about their financial condition at the time of the fire. 257 F. App'x at 860. Five days after the fire, State Farm's representative asked the Baymons in a recorded statement whether they were current on their mortgage and taxes, and they responded that they were. *Id.* Several months later, however, James Baymon admitted that some of his earlier answers had been false. *Id.* "Specifically, James Baymon *admitted* that he knew his house was scheduled for foreclosure [on a date five days after the fire] and he knew that he owed on his taxes and mortgage." *Id.* at 860-61 (emphasis added). Baymon asserted that "he *did not*

*answer the questions truthfully*" because he found them "inappropriate" and "too personal." *Id.* at 862 (emphasis added).

The cases Rose cites are more persuasive. In *Jonathan Pepper Co. v. Hartford Cas. Ins. Co.*, Hartford investigated an employee of the Jonathan Pepper Company after a fire occurred that was deemed "clear-cut arson." 520 F. Supp. 2d 977, 983 (N.D. Ill. 2007). In responding to questions about previous fire incidents, the employee's answers during a recorded statement and an examination under oath were inconsistent with his later deposition answers. *Id.* at 984-85. The district court declined to grant summary judgment, noting that the employee had "disclose[d] one of his prior fire losses" and the remaining fire losses the employee previously failed to mention "took place well before the fire in this case, so it is possible that they slipped [his] mind." *Id.* at 987. A reasonable juror could make the same finding here based on the sheer number of business matters, lawsuits, and tax issues that Rose was involved with—especially considering he did not personally manage his financial, legal, or tax affairs.

In *CSS Publ'g Co. v. American Econ. Ins. Co.*, an insurance company sought to void a policy because it alleged the employees of its insured concealed a document relating to a previous claim. 740 N.E.2d 341, 347 (Ohio Ct. App. 2000). The trial court denied summary judgment, and the Ohio Court of Appeals affirmed, noting that because "neither [employee] admitted to intentionally concealing the document in question," an issue of material fact remained. *Id.* Similarly, in this case Rose has vigorously contested that he intentionally concealed information from State Farm in his initial recorded statement.

When viewed in a light most favorable to Rose, the record supports Rose's position that a jury should determine whether he intentionally made a material misrepresentation when he answered questions during a recorded statement with State Farm on January 20, 2009.

## IV.

State Farm contends that Rose has forfeited his bad-faith claim because he "failed to set forth any issue or argument concerning" that claim in his appeal of the district court's summary judgment order. Rose responds that since the district court based its decision on his bad-faith claim entirely on its conclusion that State Farm properly voided the policy, he acted appropriately by focusing his brief on the controlling issue on appeal, namely the breach-of-

contract claim.  Additionally, because the bad-faith claim was specifically mentioned in his Civil Appeal Statement, Rose contends that State Farm was on notice about the intentions of his appeal.

Although generally "[a]n appellant abandons all issues not raised and argued in its initial brief on appeal," *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006), we retain discretion not to waive arguments a party does not specifically include in its "statement of issues." *Union Oil Co. of Cal. v. Prof'l Realty Invs., Inc.*, 72 F.3d 130, 1995 WL 717021, at \*11 n.4 (6th Cir. 1995) (Table).

In this case, Rose's bad-faith claim hinges on the existence of a valid, enforceable insurance contract.  In effect, the district court's order caused Rose's bad-faith claim to be subsumed by the breach-of-contract issue.  Had Rose included a separate section arguing the district court's analysis on his bad-faith claim was erroneous, he necessarily would have repeated the same arguments he had previously made supporting his position that his insurance contract was valid and enforceable.

We decline to find that Rose abandoned his bad-faith claim on appeal.  Furthermore, because we held in Part III that a jury question remains as to the validity of Rose's insurance policies, the district court's summary-judgment ruling on Rose's bad-faith claim—finding those policies were voided as a matter of law—cannot stand.

**V.**

For the foregoing reasons, we **REVERSE** the district court's order granting summary judgment to State Farm on Rose's breach-of-contract and bad-faith claims and **REMAND** the case to the district court for further proceedings consistent with this opinion.  Rose's appeal on his Motion to Alter or Amend Judgment under Rule 59(e) is **DENIED** as moot.