RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

J. B-K., minor child 1, by Next Friend E.B., et al.,

>    *Plaintiffs-Appellants*,

>    *v.*

SECRETARY OF KENTUCKY CABINET FOR HEALTH AND
FAMILY SERVICES; COMMISSIONER OF KENTUCKY
DEPARTMENT FOR COMMUNITY BASED SERVICES;
ELIZABETH CAYWOOD, in her official capacity as
Deputy Commissioner of the Kentucky Department
for Community Based Services,

>    *Defendants-Appellees*.

>    No. 21-5074

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:18-cv-00025—Gregory F. Van Tatenhove, District Judge.

Argued: October 21, 2021

Decided and Filed: September 16, 2022

Before: McKEAGUE, NALBANDIAN, and MURPHY, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Douglas L. McSwain, WYATT, TARRANT & COMBS, LLP, Lexington, Kentucky, for Appellants. David Brent Irvin, KENTUCKY CABINET FOR HEALTH & FAMILY SERVICES, Frankfort, Kentucky, for Appellees. **ON BRIEF:** Douglas L. McSwain, Thomas E. Travis, WYATT, TARRANT & COMBS, LLP, Lexington, Kentucky, Richard Frank Dawahare, Lexington, Kentucky, for Appellants. David Brent Irvin, Leeanne Applegate, KENTUCKY CABINET FOR HEALTH & FAMILY SERVICES, Frankfort, Kentucky, for Appellees. Catherine M. Padhi, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

NALBANDIAN, J., delivered the opinion of the court in which McKEAGUE, J., joined. MURPHY, J. (pp. 13–21), delivered a separate opinion concurring in the judgment.

———————————

**OPINION**

———————————

NALBANDIAN, Circuit Judge.  A group of foster caregivers sued the Kentucky Cabinet for Health and Family Services for denying foster care maintenance payments to children in the caregivers' care.  On appeal, we must decide whether the district court properly construed Title IV-E of the Social Security Act in holding that these children were not eligible for foster care maintenance payments.  Because the Cabinet does not have placement and care responsibility over children placed into custody of a relative or fictive kin by a court order, we affirm the district court.

I.

A.  Statutory Background

Congress passed the Adoption Assistance and Child Welfare Act of 1980 ("the CWA") to, among other things, provide states with reimbursements for expenses associated with foster care and adoption programs.[1]  The CWA created the Title IV-E program of the Social Security Act, which sets conditions for states to receive reimbursements for foster care maintenance payments ("FCMPs") made on behalf of eligible children.  42 U.S.C. §§ 670–676.  Some of Title IV-E's conditions for participating states include having a state plan approved by the Secretary of the Department of Health and Human Services ("HHS"), having a designated state agency responsible for administering the state plan, and providing FCMPs to eligible children.  *See id.* §§ 670–672.  If a state's program fails to "substantial[ly] conform[]" to the CWA's requirements, the Secretary allows the state an opportunity to implement a corrective plan and, if the state still fails to conform, withholds federal funding.  *Id.* §§ 1320a-2a(a), (b)(3)-(4).

Following a judicial determination that continuation in the home would be contrary to the child's welfare, states provide FCMPs to children removed from their homes and placed in the temporary care of a foster family home.  *Id.* § 672(a).  But not all children removed from their

———————————

[1]42 U.S.C. § 672, the main provision of the CWA at issue in this case, was originally enacted in 1962.  *See* Pub. L. No. 87-31 (May 8, 1961), 75 Stat. 76.

homes are eligible under Title IV-E. Relevant here, to be eligible for FCMPs, the removed child's "placement and care" must be the "responsibility of . . . the State agency administering the State plan approved [by the HHS Secretary]." *Id.* § 672(a)(2)(B). After states provide FCMPs, they may seek partial reimbursements from the federal government.

Kentucky receives Title IV-E funds and has a state plan approved by the HHS Secretary. The Kentucky Cabinet for Health and Family Services ("Cabinet") administers the Commonwealth's state plan for foster care and adoption assistance as Kentucky's designated Title IV-E agency. The Cabinet operates the Department for Community Based Services ("DCBS"), a sub-agency that helps the Cabinet administer the state plan. Kentucky enacts statutes and regulations to implement the program. *See* Ky. Rev. Stat. Ann. § 620.010 et seq. Kentucky also claims reimbursements under Title IV-E for FCMPs made to eligible recipients.

Kentucky law governs Kentucky's foster care system. *See D.O. v. Glisson*, 847 F.3d 374, 381 (6th Cir. 2017). The process for removing a child from the home has several potential outcomes. To start, any interested person can initiate a dependency, neglect, or abuse ("DNA") action in state court. *See* Ky. Rev. Stat. Ann. § 620.070(1). Following a DNA proceeding, a court generally has four options for placing a child. Two of the options order the child to remain at home but set in place informal adjustment agreements or protective orders. *Id.* § 620.140(1)(a)-(b). A court order may also remove the child "to the custody of an adult relative, fictive kin," or other person or facility. *Id.* § 620.140(1)(c). And finally, a court can commit the child to the custody of the Cabinet. *See id.* § 620.140(1)(d). These latter two outcomes—when a court orders a child removed from the home—are the source of the disagreement here.

The Cabinet argues that only the last outcome, when a court commits a child to the custody of the Cabinet, "creates a real foster care relationship with a child and the Cabinet." So the Cabinet does not provide FCMPs to children placed by courts into the care of a relative or fictive kin.[2] The Plaintiffs contend that placing a child in the care of a relative or fictive kin is

---

[2]Under Kentucky law, "fictive kin" are individuals not related to a child by birth, marriage, or adoption, but who maintain an emotionally significant relationship with the child. *See* Ky. Rev. Stat. Ann. § 199.011(9).

the preferred outcome for the child, but that the Cabinet's position places those caregivers in an unjustified, disadvantageous position compared to non-relative caregivers who receive FCMPs.

## B.  Procedural History

The Plaintiff caregivers brought a class action on behalf of themselves, the foster children, and members of four classes against the Cabinet and the DCBS.  The Plaintiffs accused the Cabinet of systematically denying FCMPs to eligible children without notice or a fair hearing, and doing so in a way that discriminated against relative caregivers.  The Plaintiffs sought injunctive and declaratory relief.  For its part, the Cabinet opposed the injunction and moved for both dismissal and summary judgment.

To begin with, the district court certified four classes: (1) a Children's Class, (2) a Caregivers' Class, (3) a Cabinet Custody Class, and (4) a Notice and Hearing Class.[3]  Next, the district court considered the parties' dueling dispositive motions.  When the dust settled, the district court denied the Cabinet's motion to dismiss; denied the Plaintiffs' preliminary injunction; and granted the Cabinet's summary judgment in part, except as to the Cabinet Custody Class.  *See J.B.-K.-1 v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 462 F. Supp. 3d 724 (E.D. Ky. 2020).  Relevant here, the district court held that under Kentucky law, the Cabinet did not have placement and care responsibility over children not in their custody because the Cabinet had no ability to change a child's placement without a court order.  *Id.* at 735–36.  So only members of the Cabinet Custody Class were eligible for FCMPs, assuming they met the other § 672(a) requirements.  *Id.* at 736.

---

[3](1) The Children's Class consists of all children removed from their homes after a DNA proceeding and placed into the temporary custody of a relative or fictive kin caregiver between June 16, 2014, and April 1, 2019;

(2) The Caregivers' Class consists of all relative or fictive kin caregivers who accepted temporary custody of a member of the Children's Class before April 1, 2019;

(3) The Cabinet Custody Class consists of all children who, after January 17, 2017, are or were eligible to receive FCMP benefits by virtue of their having been in the Cabinet's custody before being placed in the custody of a relative or fictive kin caregiver, and the relative and fictive kin caregivers of those children; and

(4) The Notice and Hearing Class consists of all children removed from their homes after a DNA proceeding and placed into the temporary custody of a relative or fictive kin caregiver, as well as those caregivers who, between June 16, 2014, and April 1, 2019, were not provided timely notice of potential FCMP eligibility upon placement with the caregiver, or were denied FCMP benefits without proper notice of their right to challenge and appeal such a denial.

Representatives for the three losing classes appealed, and the Cabinet did not cross-appeal the judgment as to the Cabinet Custody Class. We heard arguments from both parties but had lingering questions for HHS, which is not a party in this case. After all, the elephant in the room is whether HHS will reimburse Kentucky for FCMPs if we rule in the Plaintiffs' favor—or if Kentucky would be left holding the bag. So we asked HHS Secretary Xavier Becerra for his position. And we also asked him to reconcile some regulatory language and HHS guidance that, in our view, offered conflicting views on the question.

HHS contended that "the Cabinet does not have placement and care responsibility for children removed from their homes and placed by court order into the custody of a relative or fictive kin." (Brief for the United States as Amicus Curiae, *J.B-K., et al. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, No. 21-5074, at 6 (6th Cir. 2022).) As support, HHS looked to Kentucky law and determined that, although the Cabinet performed some services for the children, "it did not assume legal responsibility for the children's day-to-day care, and it had no authority to change their placements." (*Id.* at 8.) HHS then offered a second reason why members of the Children's Class were ineligible for FCMPs: Title IV-E requires children to be placed in a statutorily defined "foster family home," and these children were not. (*See id.* at 9 (citing 42 U.S.C. § 672(a)(2)(C)).)

In response, the Plaintiffs argued that HHS, like the district court, misinterpreted § 672(a)(2)(B) by looking to Kentucky law. They also argued that the "foster family home" point was irrelevant to the appeal, as the Cabinet never made the argument. The Cabinet didn't respond to either HHS's or the Plaintiffs' brief.

II.

First, we have a threshold issue to address. In its briefing, the Cabinet urges us to revisit our decision in *Glisson*. In that case, we found that the CWA confers an individually enforceable right to FCMPs. *See Glisson*, 847 F.3d at 380. As it stands, we are with the majority in the private-right-of-action circuit split. *Compare N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69 (2d Cir. 2019), *reh'g denied*, 935 F.3d 56 (2d Cir. 2019), *and Cal. State Foster Parent*

*Ass'n v. Wagner*, 624 F.3d 974 (9th Cir. 2010), *with Midwest Foster Care and Adoption Ass'n v. Kincade*, 712 F.3d 1190 (8th Cir. 2013).

We cannot grant the Cabinet's request. Putting aside whether we think that *Glisson* was correct, under the law-of-the-circuit doctrine, a "panel of this Court cannot overrule the decision of another panel" "unless an inconsistent decision of the . . . Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)); *see also* 6 Cir. R. 32.1(b). So until the Supreme Court says otherwise, or this court rehears this case en banc, *Glisson* still binds us.[4]

### III.

So before us now, we have representatives from three of the Plaintiff classes arguing that the district court misinterpreted § 672 when granting in part the Cabinet's motion for summary judgment. We review both grants of summary judgment and issues of statutory interpretation de novo. *Caremark, Inc. v. Goetz*, 480 F.3d 779, 783 (6th Cir. 2007).

### A. Title IV-E

When interpreting a statute we start, as we must, with the text. Above all else, we presume that Congress "says in a statute what it means and means in a statute what it says." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). That is to say, when the statutory text is unambiguous, the "judicial inquiry is complete." *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

Relevant here, states with an approved plan (like Kentucky) "shall make [FCMPs] on behalf of each child who has been removed from the home . . . into foster care if . . . the child's placement and care are the responsibility of . . . the State agency administering the State plan." 42 U.S.C. § 672(a). Basic grammar tells us that "placement" and "care" are conjunctive, and

---

[4]The Cabinet may find solace in the Supreme Court's recent grant of certiorari in a case that asks the Court to reexamine its holding that Spending Clause legislation gives rise to privately enforceable rights under 42 U.S.C. § 1983. *See Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713 (7th Cir. 2021), *cert. granted*, 142 S. Ct. 2673 (May 2, 2022) (No. 21-806).

that "responsibility" applies to both.  So for a child to be eligible for FCMPs under Title IV-E, the Cabinet or DCBS would need to have placement responsibility *and* care responsibility for the child.

Start with placement responsibility.  Since Title IV-E does not define "placement," we give the term its ordinary meaning.  And "[w]hen interpreting the words of a statute, contemporaneous dictionaries are the best place to start."  *Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019).  For Title IV-E, that takes us to around 1980.  Plainly understood, "placement" is the noun form of the verb "place."  And "place," of course means "to arrange for something." *Place*, *Black's Law Dictionary* (5th ed. 1979).  In the foster-care-specific context, "placement" means the "act of placing a child in a home with a person or persons who provide parental care for the child."  *Foster-Care Placement*, *Black's Law Dictionary* (11th ed. 2019).  Having responsibility, in turn, means "being answerable for an obligation," *Responsibility*, *Black's Law Dictionary* (5th ed. 1979), or "for the care or welfare of another."  *Responsible*, *American Heritage Dictionary of the English Language* (2d College ed. 1982).  Or as the Ninth Circuit put it, "responsibility" entails having "some real obligation or duty" to do something.  *Cleveland v. City of Los Angeles*, 420 F.3d 981, 990 (9th Cir. 2005).

All this is to say: to have placement responsibility, the Cabinet would need to have an obligation or duty to place a child in a home.  But it's hard to imagine the Cabinet having placement responsibilities in scenarios like the ones here, when it lacks the ability to place a child at all.  Indeed, only the scenario under section 620.140(1)(d) of Kentucky's juvenile code gives the Cabinet the duty of finding suitable foster parents or an institution and *placing* the children.  To find otherwise would mean the Cabinet has placement responsibility for *every* removed child.  But as the district court found, that reading renders the "placement and care" responsibility clause in § 672(a)(2)(B) superfluous.  Why would Congress set out the "placement and care" requirement if it applied to every removed child?

When interpreting statutes, "'every word . . . is to be given effect' in a statute, and interpretations that cause words 'to have no consequence' are best avoided."  *United States v. VanDemark*, 39 F.4th 318, 325 (6th Cir. 2022) (quoting *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022)); *see also* Antonin Scalia & Bryan A. Garner, Reading

Law: The Interpretation of Legal Texts 174 (2012). Section 672(a)(2)(B) requires that a removed child's "placement and care are the responsibility of . . . the State agency administering the State plan" to be eligible for FCMPs. But again, if *every* removed child's placement and care were the responsibility of the Cabinet regardless of whether the Cabinet made the placement itself, then this provision would be meaningless. We would be writing away one of Congress's requirements for FCMP eligibility.

Pushing back, the Plaintiffs agree with our general understanding of "responsibility," but disagree on how it modifies "placement." They insist that placement responsibility is "not simply the unfettered discretion to control or dictate a removed child's temporary placement but involves instead the Cabinet's ongoing *duty* and *obligation* to ensure the child is placed in a safe" living situation. (Appellant Br. at 24.) In other words, they argue that the Cabinet and the district court mistake placement *responsibility* for placement *authority*. For support, they point to the duties Title IV-E imposes on participating states as evidence that the Cabinet has placement responsibility. True, Title IV-E sets out plenty of requirements for approved state plans. But although those requirements require the Cabinet to monitor children, develop a case plan, and work to find permanent custody, *see generally* 42 U.S.C. § 671(a), those obligations fall short of placement responsibility. Most of all, they do not create an obligation to place a child. Instead, these obligations could either be "care responsibilities" or other general obligations. In the end, the Plaintiffs stretch the definition of placement too thin.

Unlike the district court, our interpretation of § 672 doesn't rely on "custody." That term has become something of a red herring on appeal because of the district court's finding that "absent a court order giving custody to the Cabinet, the Cabinet does not have placement and care responsibility over removed children within the meaning of § 672(a)." *J.B.K.-1*, 462 F. Supp. 3d at 736. But contrary to the Plaintiffs' assertion, the district court did not write "custody" into Title IV-E. *See id.* at 735 (agreeing with the Plaintiffs that *Glisson* did not create a custody condition on Title IV-E eligibility). Instead, the district court looked at Kentucky law and correctly identified that the Cabinet cannot change a child's placement without custody. *Id.* And after considering the services the Cabinet provides to all children who are removed from their homes (the same services the Plaintiffs raise before us), the district court was "not prepared

to say the Cabinet has 'placement and care' responsibility . . . by virtue of providing services alone." *Id.*

We agree, and we do so without reading custody into Title IV-E. A better way to think about custody is not as a requirement for eligibility under Title IV-E, but as an indicator under Kentucky law of who has (or doesn't have) placement responsibility.[5]

## B. Kentucky Law

We find support for our interpretation of Title IV-E in Kentucky law as well. Of course, Kentucky's foster-care system is governed by Kentucky law. *See Glisson*, 847 F.3d at 381. And Kentucky law makes clear that the Cabinet does not have placement responsibility for the Plaintiffs.

For instance, Kentucky allows the Cabinet to place some removed children with relative caregivers after the Cabinet has custody of the child. *See* Ky. Rev. Stat. Ann. § 620.090(2); *see also* (R. 98, Petrie Dep., PageID 2757 ("Once I place that child in the Cabinet's custody, [the] Cabinet gets to determine the placement at that point.").) So Kentucky's system follows what Congress wrote in Title IV-E: Including the "placement responsibility" meant that some children would qualify, and others would not. That Kentucky bases many of the Cabinet's responsibilities on whether it has custody in the first instance does not offend Title IV-E. In other federal child-aid contexts, the Supreme Court has allowed states to make eligibility determinations. *See Burns v. Acala*, 420 U.S. 575, 577–78 (1975).

Kentucky law also shows that in the Plaintiffs' case, it was the state judge making the placement, not the Cabinet. Even the Plaintiffs' expert witness agreed that, although DCBS gives recommendations to state court judges on placement, the judges are more than a "rubber stamp[]," but the one "making the final determination of whether a child is placed into the custody of the Cabinet or into the custody of a relative fictive kin." (R. 98, Petrie Dep., PageID 2755.) And in other contexts, we have said that "the juvenile court has the ultimate

---

[5]Because we find that the Cabinet does not have placement responsibility over the Plaintiffs, we decline to discuss care responsibility, as it is unnecessary to decide this case.

decisionmaking power with respect to placement and custody." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 729 (6th Cir. 2011).

None of the services that the Cabinet provides to children situated like the Plaintiffs rises to the level of placement responsibility. The Plaintiffs argue that the Cabinet has countless responsibilities under Title IV-E that give it placement and care responsibility. But again, the planning, monitoring, and other services the Cabinet provides fall short of the ability (or responsibility) to place children. And the Cabinet provides many of these services to *all* removed children, no matter where the state court placed them. *See* Ky. Rev. Stat. Ann. § 620.130. This is even the case when the child remains in the home. *See id.* § 620.140. And the Plaintiffs cannot seriously argue (nor do they try to argue) that the Cabinet has placement responsibility over children still in their homes. So we fail to see how services alone can confer placement responsibility onto the Cabinet.

## C. HHS

Our understanding of Title IV-E's plain text and Kentucky's implementation of its foster-care system tracks HHS's briefing. Like us, HHS understands Title IV-E's plain text and Kentucky law to mean that the Cabinet lacks placement responsibility over the Plaintiffs here. (*See* Brief for the United States at 8.); *see also* Children's Bureau, HHS Admin. For Children & Families, *Child Welfare Policy Manual* § 8.3A.12, Q&A 4 ("The term placement and care means that the [state] agency is legally accountable for the day-to-day care and protection of the child who has come into foster care . . . ."). So having employed the traditional tools of statutory interpretation on our own, we also agree with HHS's interpretation. *Cf. Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1906 (2022) (evaluating an agency's interpretation without any deference and instead "employing the traditional tools of statutory interpretation").[6]

---

[6]In addition, the Departmental Appeals Board ("the DAB"), the agency entity responsible for taking HHS appeals, has interpreted placement and care responsibility similarly to the way that we do today. In *Missouri Department of Social Services*, the DAB held that when a state agency does not make "*final decisions* or changes regarding a child's placement and care or otherwise have *real control* over the child's placement or care," that state agency does not have placement and care responsibility under § 672. DAB 1899, 2003 WL 22873099, at *11 (Nov. 25, 2003) (emphasis added); *cf. Mass. Dep't of Soc. Servs.*, DAB 1289, 1992 HHSDAB LEXIS 1405, at *23 (Jan. 7. 1992) ("Accordingly, we conclude that the special needs children were under the supervision of the State. The legal status of these children was determined by a voluntary placement agreement which gave the State the ultimate

It also appears that our concerns about conflicting guidance language from HHS were misplaced. Recall that HHS had advised that Title IV-E reimbursement was not available when a court unilaterally chose a child's placement, *see Child Welfare Policy Manual* § 8.3C.1, Q&A 3, but later clarified that a child in foster care would not lose eligibility just because a court ordered a placement contrary to a state agency's recommendation, *see id.* § 8.3A.12, Q&A 3. But as HHS explained in its briefing, these scenarios apply only when a child is otherwise eligible for FCMPs, which is not the case here.

One more point raised by HHS bears mention. The agency offers a second, independent reason why the Plaintiffs are not eligible for FCMPS: because the children were not placed in a "foster family home" as defined in 42 U.S.C. § 672(c)(1)(A). As HHS explained, its regulations make clear that "[f]oster family homes that are approved must be held to the same standards as foster family homes that are licensed. Anything less than full licensure or approval is insufficient for meeting [T]itle IV-E eligibility requirements." 45 C.F.R. § 1355.20(a). So if the Plaintiff children were placed in non-licensed homes (or homes with different standards than licensed homes) as the record suggests, they would not be eligible for FCMPs because they were not in "foster family homes."

But we need not decide today whether the Cabinet prevails on this ground, which it hasn't argued in any event, because it does not have placement responsibility. And so we agree with the district court that the Plaintiffs are not eligible for FCMPs under Title IV-E.

IV.

We have a couple of issues left to resolve. Recall that the district court rejected the Plaintiffs' constitutional claims about Equal Protection and Due Process. *See J.B.-K.-1*, 462 F. Supp. 3d at 738–39. The district court found that the Plaintiffs had no predicate property right for a Due Process claim, because they were not entitled to FCMPs to begin with. *See id.* at 738. Perhaps realizing that all we would do is remand on the Due Process issue if we found that they were entitled to FCMPs, the Plaintiffs did not make any arguments about Due Process in

---

authority to determine their placement . . . ."); *Pa. Dep't of Pub. Welfare*, DAB 563, 1984 HHSDAB LEXIS 1035, at *9 (Aug. 27, 1984) ("This Department, as the single State agency, retained the overall responsibility for supervision and review, under the State plan . . . .").

their first brief.  Along the same lines, the Plaintiffs developed no argumentation on the Equal Protection claim until their reply brief, only after the Cabinet argued that they abandoned their constitutional claims.

The Cabinet is correct that, in general, "an 'appellant abandons all issues not raised and argued in its initial brief on appeal.'"  *Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021) (quoting *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014)).  In addition, "it is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *Id.* (internal quotation omitted).  So by not raising these issues in their initial briefs beyond reference, the Plaintiffs abandoned these claims.

But in any event, the Plaintiffs acknowledge that we would only reach those issues if we "reache[d] a different statutory analysis" than the district court.  (Reply Br. at 32.)  We do not reach a different result (besides not relying on "custody"), and so the constitutional claims fail either way.

V.

Whether the Cabinet has placement and care responsibility over the Plaintiff-children is dispositive here.  Because we find the Cabinet does not have placement responsibility, the Plaintiffs are not eligible for FCMPs under Title IV-E.  We affirm the district court.

———————————

## CONCURRENCE

———————————

MURPHY, Circuit Judge, concurring in the judgment. In the Adoption Assistance and Child Welfare Act of 1980, Congress encouraged states to pay foster-care providers for the costs of care by agreeing to partially reimburse the states for the payments that they make on behalf of eligible children. The Act treats a child as eligible if, among other things, the state agency that manages the state's foster-care plan has "responsibility" for the child's "placement." 42 U.S.C. § 672(a)(2)(B)(i). In this case, we must ask whether a state agency has this "responsibility" when it investigates placement options and recommends a placement to a court, but the court ultimately chooses where to place the child. My colleagues answer "no" because they interpret the phrase "placement" "responsibility" as unambiguously requiring the state agency to have the "final say" over placement decisions. I find the question more difficult because speakers often say that a person has "responsibility" for something even when the person does not make the final call.

To decide this case, then, I would turn to a tie-breaking canon of interpretation. Spending laws like the Child Welfare Act must give states "clear notice" of all duties that they need to undertake in exchange for federal funds. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). This canon brings to the fore a prior decision from our court that deepened a circuit conflict on the scope of the Child Welfare Act. We held that the Act gives eligible foster-care providers a federal right to payment from the states that they may enforce by suing state actors under 42 U.S.C. § 1983. *See D.O. v. Glisson*, 847 F.3d 374, 377–81 (6th Cir. 2017). Given *D.O.*'s holding that the Act creates a right for private parties to seek state funds (not just a condition on a state's receipt of federal funds), I would apply the spending-law canon here. The Act does not give states "clear notice" that they must pay a child's foster-care provider if the relevant state agency lacks the final authority over the child's placement, and we may not impose this broad liability on the states through our resolution of ambiguous text. I thus agree that we should affirm.

I

The plaintiffs in this case—foster-care providers and their children (collectively, the "Providers")—have sued under § 1983 alleging that the Kentucky Cabinet for Health and Family Services has wrongfully denied them payments under the Child Welfare Act. When passing this Act, Congress agreed to reimburse the states for a percentage of the payments that they make to foster-care providers who care for qualifying children. *See* 42 U.S.C. § 674(a)(1). The Act establishes three basic requirements for a state to obtain this federal reimbursement. Requirement One: A state must adopt a comprehensive foster-care plan that adheres to many conditions and that has been "approved" by the Secretary of the U.S. Department of Health and Human Services (HHS). *Id.* §§ 671(a), 672(a)(1). Requirement Two: The "removal and foster care placement of" any child for which the state seeks reimbursement must itself satisfy three elements. *Id.* § 672(a)(2); *see id.* § 672(a)(1)(A). A child's "removal" from a home must result from a valid "voluntary placement agreement" or a "judicial determination" that staying in the home would harm the child. *Id.* § 672(a)(2)(A). "[T]he child's placement and care" must be "the responsibility of," as relevant here, "the State agency administering the State plan[.]" *Id.* § 672(a)(2)(B)(i). And "the child" must be placed in a qualifying location, such as a statutorily defined "foster family home" or "child-care institution[.]" *Id.* § 672(a)(2)(C). Requirement Three: The resources available to the child must fall below a certain level. *Id.* § 672(a)(3); *see id.* § 672(a)(1)(B).

This case concerns a part of the second requirement: What does the Act mean when it says that the state agency administering the plan—here, the Cabinet—must have "the responsibility" for a child's "placement and care"? *Id.* § 672(a)(2)(B)(i). This question matters because of the way in which Kentucky protects dependent, neglected, or abused children. If a Kentucky court decides that such a child must be removed from a home, the court may choose between two temporary "dispositional alternatives." Ky. Rev. Stat. § 620.140(1). The court may remove the child directly "to the custody of an adult relative, fictive kin, other person, or child-caring facility or child-placing agency[.]" *Id.* § 620.140(1)(c). Or it may commit "the child to the custody of the cabinet for placement" with one of these individuals, facilities, or agencies. *Id.* § 620.140(1)(d).

For either type of placement, the Cabinet has a baseline level of duties. The Cabinet must "assist" a court before the court makes its initial placement decision. *Id.* § 605.130(2). As the Providers' expert (a family court judge) explained, courts have no "investigative" body that can travel to homes, interview families, and evaluate options. Petrie Dep., R.98, PageID 2752–53. They instead must "rely upon . . . the executive branch agency charged with the responsibility of taking care of kids in this state[.]" *Id.*, PageID 2753. After a court makes the initial placement decision, the Cabinet next is "supposed to be keeping eyes on what's going on" with the placement. *Id.*, PageID 2758. It must develop a "treatment plan" for removed children "designed to meet [their] needs[.]" Ky. Rev. Stat. § 620.130(2); *see id.* § 605.130(1). It also must hold periodic "case conferences" to review the plan and offer "[o]n-going case work and supportive services[.]" *Id.* § 620.180(2)(a)(1)–(2); *see id.* § 600.020(30). And it must identify a "permanency goal" for removed children (such as a return to their parents or adoption) and provide "[p]ermanency services" to them. 922 Ky. Admin. Regs. 1:140(4), (10); Petrie Dep., R.98, PageID 2756, 2759.

Yet the Cabinet's authority and duties also differ across the two types of placements. If the Cabinet believes that a court's initial placement with a relative has become problematic, it must petition the court for a change. Petrie Dep., R.98, PageID 2757–58. If, by contrast, the Cabinet believes that its own placement with a caregiver has become problematic, it can switch the child to another home on its own without going back to court. *Id.*, PageID 2757. The Cabinet also supervises foster parents with whom it places children much more closely than the individuals with whom the court directly places them. *Id.*, PageID 2763–68. The Cabinet undertakes an in-depth investigation before licensing foster parents and requires them to follow comprehensive care guidelines on everything from allowances to haircuts. *Id.*; *see* 922 Ky. Admin. Regs. 1:495.

II

The parties disagree over when Kentucky's framework gives the Cabinet "placement and care" "responsibility" under the Child Welfare Act. According to the Cabinet (and HHS in an amicus brief), the Cabinet lacks responsibility for a child's initial placement because a court decides at that stage whether to grant custody to the Cabinet or another person. The Cabinet

argues that it obtains placement and care responsibility only when the court grants it custody and allows it to choose the child's "sub-placement." Under this reading, state agencies categorically lack responsibility for placement and care whenever they cannot reach final decisions over that placement and care. According to the Providers, the Cabinet has responsibility for a court's initial placement too because it must investigate placement options and make placement recommendations. And the Providers argue that the Cabinet has responsibility for the care of children placed directly with other caregivers because it must monitor these children and offer services to them. Under this view, state agencies that are not final decisionmakers can have placement and care "responsibility" if state law gives them enough placement and care duties.

I find both readings plausible. The statute provides that a "foster care placement" meets its eligibility rules if a "child's placement and care are the responsibility of" the Cabinet. 42 U.S.C. § 672(a)(2)(B)(i). Nobody really disputes the definitions of this provision's key terms. A "responsibility" is something "for which one is responsible," that is, "accountable" or "answerable." *Webster's New International Dictionary* 187 (2d ed. 1934); *Webster's Third New International Dictionary* 1935 (1986). Put another way, it is a "duty or trust" "for which one is answerable," *Funk & Wagnalls New International Dictionary* 1073 (1984), or the "particular burden of obligation upon one who is responsible," *Random House Dictionary* 1641 (2d ed. 1987). Dictionaries commonly define "placement" as the "act of placing," and they go on to define the verb "place" as "[t]o find a place, situation, home, etc., for." *Funk & Wagnalls*, *supra*, at 964; *see Webster's Third*, *supra*, at 1727. And dictionaries commonly define the noun "care" as "responsible charge or oversight" and the verb "care" as "to protect or provide for" or "look out for." *Funk & Wagnalls*, *supra*, at 201; *see Random House*, *supra*, at 314. In this case, then, we must ask whether the Cabinet has a duty to find homes for (and watch over) the children that a court places directly in the custody of a caregiver other than the Cabinet.

As in many cases, these definitions do not help all that much because both parties' views could reasonably fit the statutory text. *Cf. United States v. Hill*, 963 F.3d 528, 532–33 (6th Cir. 2020). Some understandings of the word "responsibility" support the Cabinet's reading. At least one dictionary, for example, suggests that "responsibility" can be understood to cover only duties for which one has the "ability to act without guidance or superior authority." *American Heritage*

*Dictionary* 1053 (1982).  And a court would qualify as a "superior authority" to the Cabinet for the initial placement.  In addition, the Act's use of the definite article ("the" responsibility) might signal that a state agency must have the ultimate authority over a child's placement and care—to the exclusion of all other actors.  *Cf. Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1483 (2021).

In ordinary conversation, though, it is natural for a speaker to say (as the Providers do) that one person has "responsibility" for something even if another person has the final authority over it.  A law clerk might say she has "responsibility" for a certain case on a judge's docket, but nobody would understand her to be suggesting that the judge has delegated final decisionmaking power to her.  Likewise, most people would conclude that foster parents have the "responsibility" to care for the children that the Cabinet places with them, even if the Cabinet has ultimate supervisory authority over that care.  *Cf.* 42 U.S.C. § 672(c)(1)(A)(ii)(II); Ky. Rev. Stat. § 620.360(2).  So too here, one could reasonably say that the Cabinet has "placement" "responsibility" if state law required it "[t]o find" potential homes for neglected children and to recommend a home to the court.  *Funk & Wagnalls*, *supra*, at 964.  The Act, after all, does not say anything about responsibility for the final *decision*.

In that regard, when a speaker seeks to convey that a party has (or lacks) final authority, the speaker will modify the word "responsibility" with an adjective.  So the Supreme Court has repeatedly used the phrase "ultimate responsibility" (or "initial responsibility") to make clear that a party had (or did not have) final authority.  *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2203 (2020) ("ultimate") (citation omitted); *Univs. Rsch. Ass'n, Inc. v. Coutu*, 450 U.S. 754, 760 (1981) ("initial").  To give one example, the Court's special masters have the initial responsibility to propose the resolution of cases falling within its original jurisdiction, but the Court has the "ultimate responsibility" to decide these cases.  *Kansas v. Nebraska*, 574 U.S. 445, 453 (2015) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 317 (1984)); *cf. Alaska Dept. of Env't Conservation v. EPA*, 540 U.S. 461, 488–89 (2004).  The frequent resort to these types of clarifying adjectives shows that the word "responsibility" alone does not necessarily convey either of the parties' preferred meanings in this case.  *Cf. MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 227 (1994).

HHS's guidance confirms this potential ambiguity. A regulation suggests that federal reimbursement "is not available when a court orders a placement with a specific foster care provider" rather than with the state agency. 45 C.F.R. § 1356.21(g)(3). This regulation comports with the Cabinet's narrow view of "responsibility" by presumably disallowing federal funding because the court (not the agency) made the placement. In its amicus brief, HHS reiterates this reading. Yet other guidance cuts the other way. HHS's Child Welfare Manual suggests that it "will not disallow" funding merely because a court disagrees with a state agency's recommended placement of a child—as long as the court gave "bona fide consideration" to the agency's "recommendation." Child Welfare Manual, § 8.3A.12, Question 3, R.79-4, PageID 1889. This manual suggests that a duty to offer a placement *recommendation* can suffice to give an agency placement *responsibility* (and permit federal funding) as long as the court with decisionmaking authority considered the recommendation. In its amicus brief, HHS suggests that the question here does not "implicate[]" this guidance, but I do not understand its logic. HHS Br. 14.

### III

Given that both parties offer reasonable interpretations, where else should we look to pinpoint the breadth of the required "responsibility"? The Supreme Court's precedent provides one place: it has often invoked a specific canon of construction to resolve ambiguities in this case's context. Congress passed the Child Welfare Act under the Spending Clause. *See* U.S. Const. art. I, § 8, cl. 1; *Suter v. Artist M.*, 503 U.S. 347, 356 (1992). The Court has long described this type of spending legislation as "much in the nature of a contract" between the federal government and the states. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Congress agrees to give the states money; the states agree to follow all federal conditions on the receipt of these funds. *See* 42 U.S.C. §§ 671(a), 672(a)(1), 674(a).

This contract analogy has led the Court to adopt, as a canon of statutory interpretation, that Congress must impose "unambiguous[]" conditions on its distribution of federal funds to the states. *Arlington*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17). A state cannot be said to have accepted the funds with awareness of the strings attached if a court imposes those strings by resolving ambiguities in the spending law long after the state has already entered into the

"contract." *Id.* A spending law instead must provide "clear notice" of all conditions on federal funds at the time that a state is mulling over whether to accept the funds. *Id.*; *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570–71 (2022). The Individuals with Disabilities Education Act, for example, allows courts to order a state to pay the attorney's fees of parents who successfully challenge the state's educational plans for their child. *Arlington*, 548 U.S. at 297. Yet the Supreme Court rejected the argument that this attorney's fees provision covered expert fees too because the provision would not have given states clear notice of a duty to pay those types of fees when they chose to participate in the federal program. *Id.* at 303.

How does this ambiguity-resolving canon of construction apply here? The answer may well depend on the perspective from which we examine it.

On the one hand, the canon strongly supports the Cabinet's narrow reading of the required "responsibility" in the procedural posture of this case (and others like it). The case arises under 42 U.S.C. § 1983, which allows a plaintiff to sue state actors for the "deprivation of any rights" "secured by" federal "laws[.]" *Id.* Our precedent authorizes this type of suit. We and two other circuit courts have held that the Act gives foster-care providers a federal "right" to foster-care payments under § 1983 because the Act indicates that participating states "shall" make these payments on behalf of eligible children. 42 U.S.C. §§ 672(a)(1), 675(4)(A); *see D.O.*, 847 F.3d at 377–81; *N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 76–85 (2d Cir. 2019); *Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 978–82 (9th Cir. 2010).

Relying on *D.O.*, the Providers seek to impose a duty on Kentucky to make foster-care payments for children that a state court places with a provider other than the Cabinet. To impose this liability, though, Congress needed to provide "clear notice" that Kentucky would be on the hook for these additional payments at the time that it opted to participate in the foster-care program. *Arlington*, 548 U.S. at 296. And because Kentucky could have reasonably believed that the Child Welfare Act applied only when the Cabinet itself had final placement authority, we cannot impose this additional burden on the state fisc after the fact. *See id.* The Providers' § 1983 suit thus resembles the suits in *Cummings* or *Arlington*—cases in which the Supreme Court limited the states' obligation to pay private parties because the relevant spending law did

not impose that duty in a clear enough fashion. *See Cummings*, 142 S. Ct. at 1571–76; *Arlington*, 548 U.S. at 300.

On the other hand, *D.O.* does not provide the only way to look at the Child Welfare Act. Other judges have challenged the claim that the Act creates federal "rights" in foster-care providers enforceable under § 1983. *See Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1196–1202 (8th Cir. 2013); *N.Y. State Citizens' Coal. for Children v. Poole*, 935 F.3d 56, 57–61 (2d Cir. 2019) (Livingston, J., dissenting from the denial of rehearing en banc); *Wagner*, 624 F.3d at 983 (Callahan, J., concurring). These judges view § 672(a)(1)'s command to pay foster-care providers as establishing a *condition* on the federal government's duty to reimburse the states, not a *right* in the providers to obtain state funds. *See Midwest Foster Care*, 712 F.3d at 1200–01; *Poole*, 922 F.3d at 90 (Livingston, J., dissenting). They also highlight the limited nature of the Act's *explicit* remedies. *See Midwest Foster Care*, 712 F.3d at 1200; *Poole*, 935 F.3d at 87, 98 (Livingston, J., dissenting). The Act allows HHS to audit a state's program to determine whether the state is in "substantial conformity" with the Act's requirements and to reduce a state's federal reimbursement by an amount "related to the extent of" any "failure" to substantially comply with those requirements. 42 U.S.C. § 1320a-2a(a), (b)(3)(C). If HHS finds that a state has not substantially complied with the Act, the state may also seek administrative review of this decision in a "Departmental Appeals Board" and then in court. *Id.* § 1320a-2a(c)(2)–(3).

If we consider the meaning of the word "responsibility" from the perspective of a state caught up in an HHS audit, it puts the Supreme Court's clear-notice canon in a far different light. Suppose a state decided to pay a foster-care provider even though a state court (not a state agency) had final placement authority over the child. Suppose further that this state sought (and initially received) reimbursement from HHS for these payments. If HHS later attempted to claw back the federal funds on the ground that the state agency lacked the necessary "placement" "responsibility," the Cabinet's narrower reading of "responsibility" in this case (not the Providers' broader reading) would bar the state from seeking federal reimbursement. And a state in this predicament could argue that the statute did not give it "clear notice" that its state agency must have this final decisionmaking power. *Arlington*, 548 U.S. at 296.

Nor is this alternative perspective far-fetched. The Departmental Appeals Board has sometimes denied federal reimbursement for state foster-care payments on the ground that the relevant state agency lacked "the ability to control where [the relevant] child [was] placed, and to alter the plan of care without further petitioning of the court to do so." *Mo. Dep't of Soc. Servs.*, DAB 1899, 2003 WL 22873099, at *11 (H.H.S. Nov. 25, 2003) (quoting *Md. Dep't of Hum. Res.*, DAB 1225, 1991 WL 634982, at *4 (H.H.S. Feb. 7, 1991)); *see also Wash. Dep't of Soc. & Health Servs.*, DAB 280, 1982 WL 189550, at *5 (H.H.S. Apr. 22, 1982). Yet this Board did not consider the Supreme Court's clear-notice canon before holding that these states were ineligible for the requested federal funding based on the Board's narrow view of the required "responsibility." If foster-care providers did not have a federal "right" to payment under § 1983, moreover, a judicial decision adopting the Providers' broader reading of "responsibility" might not affect a state's budget. The state's refusal to pay a foster-care provider when a court directly placed a child with the provider (rather than with the relevant state agency) might not put the state in *substantial* noncompliance with the Act. *See* 42 U.S.C. § 1320a-2a(a). Even if it did, moreover, HHS could refuse reimbursement only in an amount "related to the extent" of the violation. *Id.* § 1320-2a(b)(3)(C).

\* \* \*

The Supreme Court may ultimately agree with the Eighth Circuit in *Midwest Foster Care* and with Judge Livingston in *Poole* that the Child Welfare Act establishes only conditions on a state's receipt of federal funds. Under the Supreme Court's clear-notice canon, that view might affect the way in which we approach interpretive questions about the Act, including the question at issue here about the meaning of the phrase "placement and care" "responsibility." At this time, however, we are bound by *D.O.*'s holding that providers have a right to state payment enforceable in suits under § 1983. Under *D.O.*'s holding that the Act imposes significant obligations on the states, we must resolve all potential ambiguities in the Act in a way that reduces those obligations. *See Cummings*, 142 S. Ct. at 1569–70. And because a state would not have "clear notice" of the duty to pay foster-care providers who are chosen directly by a court, I would interpret the Act not to impose this state-funding obligation. *Arlington*, 548 U.S. at 296.

For these reasons, I concur in the judgment affirming the district court's decision.